**SLICK AIRWAYS, INC.**

v.

**UNITED STATES.**

No. 60–58.

United States Court of Claims.
July 19, 1961.

Robert J. Corber, Washington, D. C., for plaintiff. Richard P. Taylor and Steptoe & Johnson, Washington, D. C., were on the brief.

Lewis A. Dille, Kensington, Md., with whom was Asst. Atty. Gen. William H. Orrick, Jr., for defendant. Thomas A. Hett, Washington, D. C., was on the briefs.

DURFEE, Judge.

This is a suit on a contract for air transportation of Government cargo by the plaintiff, a certificated air carrier. The contract, dated June 30, 1951, provided a rate of 70 cents per air mile, which was warranted by the carrier to be

the lowest appropriate tariff then in effect and on file with the Civil Aeronautics Board. The original contract period was one year and the contract specified the estimated mileages involved. The rate of 70 cents per air mile was the lowest applicable tariff rate between July 1, 1951, and March 20, 1952, and the plaintiff submitted bills and was paid at that rate for shipments during that period.

On February 20, 1952, the plaintiff published a revision of its Charter Tariff No. 1, ATB No. 1, CAB No. 17, for Curtiss C–46 aircraft for 1,000 miles and over, the tariff referred to in the contract. This increased the tariff rate from 70 cents to 77 cents per air mile. The defendant received notice of publication but, as it conceded in oral argument, it filed no objection or request for suspension of the tariff increase with the CAB, either before or after March 21, 1952, the date on which the increased tariff rate of 77 cents became effective.

As a result of a clerical error, Slick continued to bill the defendant at the rate of 70 cents per mile and was paid at this rate from March 21, 1952, through June 30, 1952, for 216 flights. The plaintiff is now seeking payment at the revised tariff rate, that is, seven cents per mile more than it has received for shipments between the above dates. The contract was later renewed through September 30, 1952, but the parties agree that 77 cents per mile is the correct rate for this period. While there is no dispute as to the proper rate between July 1, 1951, and March 20, 1952, there is a dispute as to how the mileage factor in the charges is to be calculated. The defendant has asserted counterclaims on the theory that the computation of the distances flown was excessive and that it has, therefore, overpaid the plaintiff.

The mileage controversy arises in the following fashion. While the contract sets forth the mileages to be used between shipping and receiving points, the tariff specifies that the mileages are to be determined with reference to "airport-to-airport" distances. The defendant in contending for the "airport-to-airport" rates says that the mileages are to be determined by reference to the Department of Commerce publication Airline Distances between Cities in the United States [1] (commonly called the "Redbook.") The plaintiff maintains that in the absence of a CAB regulation delineating how "airport-to-airport" mileages for charter flights are to be determined the specific contract mileages must be applied. The question is, then, what standard is to be employed in determining "airport-to-airport" miles.

First, however, we will consider the question of whether the charges from March 21, 1952, through June 30, 1952, should be based upon the revised tariff rate of 77 cents per mile or upon the original contract rate of 70 cents.

In answer to the plaintiff's contention that it is entitled to the minimum tariff rate of 77 cents per mile, the defendant asserts that the United States can lawfully accept from a carrier a contract rate that is less than the tariff rate available to all other shippers and that the contract which provided a rate of 70 cents per mile was such a contract by which the plaintiff was bound for the duration of the original contract period.

As an air carrier operating under a certificate of public convenience and necessity for air cargo in interstate commerce, the plaintiff was subject to the Civil Aeronautics Act and the economic regulation of the Civil Aeronautics Board. Section 403(b) of the Civil Aeronautics Act, 49 U.S.C.A. § 483(b) (now known as the Federal Aviation Act of 1958, 49 U.S.C.A. § 1301 et seq.), provided:

"No air carrier or foreign air carrier shall charge or demand or collect or receive a greater or less or different compensation for air transportation, or for any service in connection therewith, than the rates, fares, and charges specified in its currently effective tariffs; and no

1. Coast and Geodetic Survey, Special Publication 238.

air carrier or foreign air carrier shall, in any manner or by any device, directly or indirectly, or through any agent or broker, or otherwise, refund or remit any portion of the rates, fares, or charges so specified, or extend to any person any privileges or facilities, with respect to matters required by the Board to be specified in such tariffs, except those specified therein. Nothing in this chapter shall prohibit such air carriers or foreign air carriers, under such terms and conditions as the Board may prescribe, from issuing or interchanging tickets or passes for free or reduced-rate transportation to their directors, officers, and employees and their immediate families; witnesses and attorneys attending any legal investigation in which any such air carrier is interested; persons injured in aircraft accidents and physicians and nurses attending such persons; and any person or property with the object of providing relief in cases of general epidemic, pestilence, or other calamitous visitation; and, in the case of overseas or foreign air transportation, to such other persons and under such other circumstances as the Board may by regulations prescribe."

While the Act is definite as to the classes of persons to whom air carriers are authorized to furnish free or reduced-rate transportation, the Government is not included in such exceptions to the general prohibition against "greater or lesser or different compensation for air transportation * * * than the rates, fares, and charges specified in its currently effective tariffs."

The defendant cites the Certificated Air Carrier Military Tender Investigation, CAB Docket No. 9036, Order E–13536, February 25, 1959, for the proposition that the Civil Aeronautics Board has held that section 403 of the Civil Aeronautics Act does not prohibit a reduced rate to the Federal Government. This is true only as far as it goes. In that case the Board was considering a joint military air transportation agreement between the military agencies of the Government and an association of air carriers providing discounts for official military traffic from regular fares via both scheduled and charter services. At pages 16 and 17 of its mimeographed opinion, the Board said:[2]

"3. Aside from the considerations of competitive necessity and lower costs of service, the military establishment urges the approval of the 10 per cent military discount, as a matter of law, because the Federal Government is the beneficiary. However, there is no provision in the Act which expressly authorizes the granting of reduced-rate air transportation to the Federal Government, nor does our review of the legislative history of the Act manifest any intention on the part of the Congress to permit preferential treatment of official military or Government travel. [Citing cases.] Also, while there are dicta of the Supreme Court indicating that discrimination in favor of the Government is permissible without specific statutory authorization, [citing cases] we are unable to find a square holding to that effect. In any event, it is not necessary under the circumstances of this case for us to predicate our conclusion solely upon any theory that the Federal Government may be granted discriminatory rate concessions without any explicit provision therefor in the Federal Aviation Act. Rather, the fact that the Federal Government is the recipient of the discriminatory military fare discount is itself another circumstance or condition material to the issue of the validity of the discount. This additional factor, taken into consid-

2. The opinion recites that "Durfee, Chairman, and Gurney, Vice Chairman, did not take part in the decision."

eration with other factors, serves to buttress our conclusion that the circumstances and conditions surrounding official military travel are substantially different from those of standard-fare travel to justify fare concessions to the military establishment."

In brief, the Board did not recognize any right of the Government to preferential rates; rather it approved the military discount because "the circumstances and conditions surrounding official military travel are substantially different from those of standard-fare travel to justify fare concessions to the military establishment." Furthermore, the Board's approval of the discount still required the publication of an appropriate tariff as required by section 403(b) of the Act, supra, and the regulations of the CAB.

■ The defendant next directs our attention to section 22 of the Interstate Commerce Act, 24 Stat. 379, 387, as amended, 49 U.S.C.A. § 22, which provides that "[n]othing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States * * *." Section 1 of the Act makes it clear, of course, that its provisions apply to common carriers engaged in surface or pipeline transportation. The Act does not apply to the regulation of rates in air transportation, which was accomplished, during the period involved herein, by the Civil Aeronautics Act, supra.

It is the defendant's contention that while there is nothing in the Civil Aeronautics Act which permits reduced rates to the United States, there is nothing in the Act to prevent it. The position taken is that in the enactment of this legislation the intention was expressed that the Act would be construed together with section 22 of the Interstate Commerce Act, as a matter of policy. Without setting forth the legislative history of the

Civil Aeronautics Act in detail, it is apparent that proposed sections expressly permitting reduced rates for air transportation to the Government were subsequently deleted at the time of enactment.[3]

The suggested, implicit, or permissive superimposition of section 22 of the Interstate Commerce Act on the Civil Aeronautics Act was urged on the CAB without success in the Certificated Air Carrier Military Tender Investigation, supra. In United States v. Associated Air Transport, Inc., 1960, 275 F.2d 827, 838, the Court of Appeals for the Fifth Circuit, in considering the Government's assertion of preferential status under the Civil Aeronautics Act, said that the "short of it is that when Congress seeks to give the Government a preferred transportation status, it does so in plain terms." And it illustrated the point by referring to section 22 quotations for surface shipments.

The cases cited for the proposition that the Government can accept a rate which is less than similar commercial rates without exception deal with surface transportation as to which the United States occupies an expressly preferential status under section 22 of the Interstate Commerce Act. But under the Civil Aeronautics Act, the Government had the right to reduced rates only pursuant to tariffs lawfully published and filed by a carrier under section 403 of the Act. Moreover, such reduced rates would be lawful under the Act only when the circumstances and conditions surrounding the transportation were shown to be substantially different from those of private shipments of air cargo, as was enunciated by the CAB in the Certificated Air Carrier Military Tender Investigation, supra.

■ The original charter rate of 70 cents per mile as specified in the Slick contract of June 30, 1951 was the regular charter tariff rate which was amended

3. See S. 3027, S. 3420, 74th Cong., 1st Sess.; H.R. 5234, H.R. 7273, S. 2 as originally introduced, and substitute S. 2, 75th Cong., 1st Sess. Substitute S. 2 omitted the provision for Governmental reduced rates contained in S. 2 as originally introduced, and in that form the bill was enacted.

to 77 cents per mile on March 21, 1952. That then became the minimum current tariff rate [4] and the only one which could have been legally charged by Slick.

In United States v. Associated Air Transport, Inc., supra, 275 F.2d at page 832, the court said:

"The tariff is, as all recognize, crucial. * * *

"Filed as it was under compulsion of § 403(a) of the Civil Aeronautics Act of 1938, the tariff carried the statutory mandate of § 403(b) that it and it alone was to be the sole standard for services to be rendered and charges assessed and collected. In the implementation of this stringent legislative policy, the courts have been equally emphatic that the basis for the charge or credit must be found in the tariff. If it is not in the tariff, it is not allowable. It is not a mere matter of contract. For 'a rate once regularly published is no longer merely the rate imposed by the carrier, but becomes the rate imposed by law.' Louisville & N. R. Co. v. Dickerson, 6 Cir., 1911, 191 F. 705, 709. 'Such tariffs, at least those which are factors in determining the carrier's charges, have the force and effect of statutes.' American Ry. Express Co. v. American Trust Co., 7 Cir., 1931, 47 F.2d 16, 18. The tariffs are both conclusive and exclusive; they may not be added to through reference to outside contracts or agreements or understandings or promises. (Footnotes omitted.)"

We concur in this expression of the controlling importance of tariffs.

But the defendant claims that, notwithstanding any right to payment at the revised tariff rate, Slick Airways has waived its right to collect the additional charge for the time between March 21, 1952, and June 30, 1952. The contention is that because it rendered the accounts at the lower 70-cent rate and accepted payment at that rate without protest until much later Slick has lost the right to recover at the proper tariff rate. Thirty days prior to March 20, 1952, the defendant had been put on legal notice that Slick Airways had published and filed an increased tariff. If it wished to object to the increase as being contrary to the terms of the contract, it should have asked the CAB to suspend and investigate the new tariff. Even after the thirty-day notice period, the Government could have asked the CAB to investigate the new tariff. Certainly the primary jurisdiction as to whether this was a just and reasonable rate rested with the CAB. Having chosen not to exercise its right to object to the revised tariff, the Government can hardly now argue that Slick has waived its right to be paid in accordance with that duly effective tariff. Once the tariff became effective, the carrier was obliged to enforce it and it did not waive its power to do this because of a clerical error in billing. The tariff must control in the event of an inconsistency between it and a contract of carriage.

In the mileage controversy the Government seems to face about and champion the tariff. The tariff involved in this case contemplated "airport-to-airport" mileages at the per-mile rates of 70 cents and, later, 77 cents. Proceeding on the premise that a tariff must provide a standard by which the total charge may be determined the defendant contends that the provision for "airport-to-airport" rates should be construed with reference to the CAB Economic Regulations, Part 221.54, 14 C.F.R. § 221.54, which says that tariffs shall provide a method for determining distances using either specific mileages written into the tariff itself, or by reference to an approved distance guide, or, as a temporary expedient, by reference to the Redbook. The Government believes that the Redbook mileages must apply inasmuch as

---

4. There is no assertion made by the defendant that any other shipper secured the same charter service at a lesser rate which would, of course, have been in violation of the Act and the tariff regulations already discussed.

the tariff does not provide any of the other CAB-approved guides. However, this regulation did not become effective until 1954 and, at the time of the performance of the transportation here involved, there was no regulation pertaining to mileage guides. The defendant's position on this point is that the regulation merely formalized what had been the attitude of the CAB as early as 1948 as expressed in its order in the Air Freight Rate Investigation, CAB Docket No. 1705, 9 CAB 340, which prescribed Redbook usage to determine minimum "airport-to-airport" rates for scheduled transportation.

◼ In the absence of an unequivocal expression of regulatory agency policy in the matter of mileage guides during the period in question, we cannot accept the Government's contention that the Air Freight order, dealing with a means to insure minimum competitive rates for scheduled flights, should be interpreted as an expression of regulation over charter shipments such as those involved in the tariff and contract in suit. The plaintiff's theory is that the mileages specifically provided in the contract should be applied to the shipments since in 1952 there was no effective, prescribed method for computing the distances under the applicable tariff. Concisely, the position taken is that the governing statute and the applicable tariff are to be read into the contract becoming part of the total agreement. The contract provisions are controlling unless they are inconsistent with the statute or the tariff, in which case they must bow. This exposition is consistent with our determination as to whether the rate of 70 cents or 77 cents should prevail. We said that the original contract rate of 70 cents (which was also the applicable tariff rate) prevailed until such time as it became inconsistent with the revised tariff rate of 77 cents.

The tariff did not, nor was it required to, specify a mileage guide applicable to all shipments under the tariff. But the contract between the parties clearly sets forth the mileages for the contemplated flights. We can see no reason why reference should not be made to the contract to determine the distances for transportation performed under the tariff. The Associated Air Transport case, 275 F.2d at pages 834–835, held that a tariff, although taking the ascendancy over other agreements in the broad matter of rates, need not contain every element necessary for the shipper to then and there calculate the full and final cost of his shipments.

◼ Although the tariff, as the primary measure of a rate, may not be altered or changed by extraneous incorporations, it may, in the absence of law or regulation to the contrary, be completed by reference to guides or standards which are outside the tariff. The parties to this contract, controlled by the tariff, agreed upon the mileages involved. Nothing required that the tariff itself set out the mileages or specify where they could be found. Therefore, the plaintiff is within its rights in expecting to be paid for the shipments based on the distances outlined in the contract.

The plaintiff should have been paid at the revised tariff rate of 77 cents for all shipments made between March 21, 1952 and June 30, 1952. Further, the number of miles involved in any given shipment during the life of the contract should be computed as provided for in the contract. The defendant's motion for summary judgment is denied and the counterclaims will be dismissed. The plaintiff's motion for summary judgment is granted. Plaintiff is entitled to recover and the amount of the judgment will be computed pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.