**NORTHWEST AIRLINES, INC.**

v.

**The UNITED STATES.**

**No. 65–69.**

United States Court of Claims.

July 14, 1971.

Henry Halladay, Minneapolis, Minn., attorney of record, for plaintiff. Dorsey, Marquardt, Windhorst, West & Halladay, Minneapolis, Minn., of counsel.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON DEFENDANT'S MOTION AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

COLLINS, Judge.

In this case plaintiff claims that defendant is contractually indebted to it for unused reservations made by defendant on plaintiff's regularly scheduled commercial flights from points in the United States to points in the Orient. Defendant denies that a valid debt exists. For the reasons which follow we agree with plaintiff.

On May 8, 1965, plaintiff and defendant (represented by the Military Air Transport Service (MATS) )[1] entered into a contract under which plaintiff obligated itself to provide air transportation service between military bases or airports in the United States and several points in the Pacific Far East. The service to be furnished by plaintiff was divided into various categories. Category A service, that giving rise to the present litigation, designated passenger service to be provided on regularly scheduled commercial flights on an advanced blocked-space basis. The fares for Category A service were approximately one-half the regular economy fares.

The contract, as later amended, required MATS to book Category A seats for a given month 45 days in advance of the first day of that month. MATS could cancel reserved seats no later than 15 days prior to the date of the flight to which the cancellation applied. The contract further provided that "[a]ll passenger seats for which schedules have been agreed upon and which are not cancelled in accordance with the aforesaid, will be treated as 'NO SHOWS' in the event they are not filled by the Government for the flight on which scheduled." The Government was required to pay for no shows to the extent that Category A reservations exceeded Category A traffic during any month, and only to the extent that no-show seats were not otherwise utilized by the plaintiff. The reservation procedures for Category A traffic became effective March 1, 1966, and were carried forward to a new contract, effective July 1, 1966.

Plaintiff claims that during the months of April, May, and June of 1966 there were 713 unused no-show seats, that there were 958 such seats during December of that year, and that there were 839 in January 1967. Plaintiff's claims for December 1966 and January 1967 were denied by the General Accounting Office, which stated as follows:

\* \* \* The charges are not provided for in your tariffs lawfully on file with the Civil Aeronautics Board. Consequently, the charges cannot be allowed because allowance would violate the provisions of Section 403(b) of the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1373(b). \* \* \*

---

1. MATS was later to become known as Military Airlift Command (MAC).

In this suit plaintiff seeks to recover for the no shows for December 1966, January 1967, and, in addition, for April, May, and June of 1966. At present, the only issue before the court is that of liability, and both parties have moved for summary judgment.

The principal controversy in this case centers around section 403 of the Federal Aviation Act of 1958, 49 U.S.C. § 1373 (1964), which provides in relevant part:

(a) Filing, posting, and publication; rejection of tariffs.

Every air carrier and every foreign air carrier shall file with the Board, and print, and keep open to public inspection, tariffs showing all rates, fares, and charges for air transportation between points served by it, and between points served by it and points served by any other air carrier or foreign air carrier when through service and through rates shall have been established, and showing to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation. * * *

(b) Observance of tariffs; granting of rebates.

No air carrier or foreign air carrier shall charge or demand or collect or receive a greater or less or different compensation for air transportation, or for any service in connection therewith, than the rates, fares, and charges specified in its currently effective tariffs * * *. * * *

The applicable tariff (No. 368) on file with the Civil Aeronautics Board (CAB) contains only the following brief reference to reservations:

A. *Category A*—Reservations for travel under Category A fares herein may be made only by the U.S. Department of Defense through its Military Air Transport Service.

The question, then, is whether the plaintiff carrier can collect under the no-show provisions of the contract although the applicable tariff is silent on the issue.

We dealt with a similar issue a decade ago in *Slick Airways, Inc. v. United States*, 292 F.2d 515, 154 Ct.Cl. 417 (1961). In *Slick* the court first decided that the carrier was entitled to be paid at the rate set forth in the applicable tariff rather than at a lower, and obviously inconsistent, rate specified in the contract. Then the court proceeded to a second issue, one which is of far more precedential value here than is the first.

The second issue in *Slick* arose in the following manner: Slick's filed tariff specified that mileages were to be determined with reference to airport-to-airport distances. At the time of performance of the contract, however, neither the tariff nor CAB regulations contained a reference to a mileage guide. The contract, on the other hand, set forth specific mileages to be used between shipping and receiving points. The Government contended that the contract mileages could not prevail since the CAB had earlier held that *Redbook*[2] mileages should be used to determine airport-to-airport rates for scheduled transportation. Slick's position was that the contract mileages should control because "there was no effective, prescribed method for computing the distances under the applicable tariff." *Id.*, 292 F.2d at 520, 154 Ct.Cl. at 426.

The court agreed with Slick, reasoning that since the tariff did not, and was not required to, specify a mileage guide, and, since the contract clearly did so specify, there was no reason why reference should not be made to the contract. The principle which emerges from *Slick* is, in the court's words, that "[a]lthough the tariff * * * may not be altered or changed by extraneous incorporations, it may, in the absence of law or regulation to the contrary, be

---

2. Department of Commerce, Airline Distances Between Cities in the United States. This publication is commonly referred to as the *Redbook*.

completed by reference to guides or standards which are outside the tariff." *Id.*, 292 F.2d at 520, 154 Ct.Cl. at 427. Stated more directly, "[t]he contract provisions are controlling unless they are inconsistent with the statute or the tariff, in which case they must bow." *Id.*, 292 F.2d at 520, 154 Ct.Cl. at 426. Applying the *Slick* rule to the present case, the reservation and no-show provisions of the contract will be given effect unless they are inconsistent with section 403 of the Federal Aviation Act or with the tariff.

■ Clearly, the contract provisions here under consideration are inconsistent neither with section 403 nor the tariff. Section 403(a) requires that every carrier file with the CAB tariffs showing its rates, fares, charges, and other pertinent information. Plaintiff had such a tariff on file. But, as the court recognized in *Slick*, a tariff is not required to be exhaustive of every aspect of a carrier's operation—rather, it may "be completed by reference to guides or standards which are outside the tariff." *Id.*, 292 F.2d at 520, 154 Ct.Cl. at 427. Here, the plaintiff's filed tariff sets forth in detail its rates, fares, and charges for the air service desired by MATS. It contains, however, only the briefest mention of reservation procedure for Category A transportation. Common sense dictates that the tariff, standing alone, does not even provide the minimum structure necessary for a reservation system. The tariff contemplates completion, in this respect, from without. Given the circumstances, there appears no reason why the parties should not be allowed to complete an otherwise incomplete and insufficient tariff in their contract.

The Government seizes upon language appearing in an order of the CAB, Domestic Trunklines, Tariff Agreement, 35 C.A.B. 881 (1962), to the effect that "[i]mplementation of the no-show agreement will necessitate a filing by the carriers of appropriate tariff rules." *Id.* at 886. The order concerned an agreement among 11 major airlines relating to ticketing time limits and a reservation service charge. The agreement, which affected the entire traveling public, called for a service charge on no shows of "$5 or 50 percent (whichever is greater) of the applicable one-way local fare of the first remaining validated flight coupon, except that in no case will the charge exceed $50 or the total value of such coupon." *Id.* at 885.

■ We do not read the Board's order, however, as the Government apparently does, as a broad statement of policy on the necessity of including no-show provisions in tariffs. We read it as a statement directed to the situation the Board had before it at the time. As we held in *Slick* and as recognized in United States v. Associated Air Transport, Inc., 275 F.2d 827 (5th Cir. 1960), a tariff may be completed by reference to extraneous documents. Furthermore, there appear to be good reasons for refusing to impose a single uniform standard of completeness for all tariffs filed with the CAB. Circumstances differ from case to case, and such a single standard might well destroy desirable flexibility on the part of the carriers while, at the same time, failing to serve the aims of section 403(b).

■ Section 403(b) has as its purpose the protection of the public:

The sections [403(b) and 404(b)] are designed to insure that rates and services are offered on an equal basis to all who seek to use the air carriers. They were intended to protect the traveling public and were designed to effectuate the "rule of equality" in the air transportation industry.

Transcontinental Bus System, Inc. v. CAB, 383 F.2d 466, 475 (5th Cir. 1967), cert. denied, 390 U.S. 920, 88 S.Ct. 850, 19 L.Ed.2d 979 (1968). Obviously, where the entire traveling public is affected, there is every reason to require that a tariff set forth in detail the service charge for no shows. This was the case in *Domestic Trunklines, Tariff Agreement, supra.* Where the only "traveler" concerned with a particular

tariff is a Government agency (*e. g.*, MATS), however, there is less reason for requiring that the tariff be complete in every respect and no harm in permitting the carrier and the agency to complete the tariff contractually.

Section 403(b) prohibits a carrier from deviating from its filed tariff. This court gave effect to subsection (b) in the first part of the *Slick* opinion. Where the contract terms deviate from the provisions of the applicable tariff, the tariff prevails; but where the contract merely completes or supplements the tariff in a manner not inconsistent with the provisions of the tariff, the contract should be given full effect. In the present case the contract between the carrier and the Government does not vary or deviate from the rates, fares, and charges contained in the carrier's published tariff. It merely provides that reservations which are unused and uncanceled will have to be paid for, as though they had been used, at the rates set forth in the tariff. The contract does not provide for new or different transportation rates—only for a reservation system necessary to its efficacy.

What we have said above with regard to section 403 necessarily disposes of the argument that the no-show provisions are in conflict with the tariff.

The Government urges that United States v. Associated Air Transport, Inc., *supra*, requires that we hold the no-show provisions invalid. But, just as *Associated* presented no problem for the court in *Slick*, it presents no problem here, for in *Associated* the fifth circuit, although holding that the tariff in question was self-sufficient, expressly recognized that a tariff need not be explicit in every detail:

> It is not essential to a valid tariff that it, alone or by incorporation by reference, afford the tools to a shipper to then and there calculate his dollar cost before shipment is made. [Footnote omitted.]

275 F.2d at 835. *See* Slick Airways, Inc., *supra*, 292 F.2d at 520, 154 Ct.Cl. at 426.

In addition to its argument discussed above, the Government asserts that the no-show provision is an unenforceable penalty. The sum and substance of the Government's contentions in this regard seem to be that the no-show provision "has no bearing and no relation to the actual damages suffered, and is in an amount that is conceivably larger than any actual damages that are likely to be sustained * * *." In support of this position the Government once again refers the court to *Domestic Trunklines, Tariff Agreement*, *supra*, wherein the CAB approved, tentatively, a no-show charge of $5 or 50 percent of the applicable one-way fare. Such charge was not to exceed $50 however. The Board expressed concern that the charge might be in excess of that needed to accomplish the desired purpose, but gave its assent because, being without experience or guidelines, it was "unable to determine what otherwise would be a reasonable service charge." *Id.* at 885.

*Domestic Trunklines, Tariff Agreement* is not a very valuable precedent in this instance. Its authority is severely limited by the Board's own admission that it had no basis upon which to pass upon the reasonableness of the charge involved. Moreover, since the no-show provisions there under consideration were to apply only to domestic flights, the $50 ceiling approved in the order cannot be permitted to guide or control our consideration of this case where the flights involved were all overseas flights from the United States to the Orient.

On this record we cannot say that the no-show clause with which we are dealing imposes an unreasonable charge or penalty on the defendant. On the contrary, the charge it imposes on the defendant for failing to cancel reservations on time (which, it should be emphasized, amounts to only approximately one-half of the regular economy fare)

appears to be a reasonable estimate of damages in a situation where a precise estimate of damages would be a difficult undertaking. Our situation is much like that with which the CAB found itself faced in *Domestic Trunklines, Tariff Agreement, supra.* Without any appropriate guidelines as to reasonableness of the no-show provisions, we must accept the determination arrived at by the parties at arm's length and expressed in their contract.[3]

For the foregoing reasons, defendant's motion for summary judgment is denied, plaintiff's cross-motion for summary judgment is granted, judgment is entered for plaintiff, and the case is returned to the trial commissioner for a determination as to the amount of liability pursuant to Rule 131(c).

See also 189 Ct.Cl. 280, 417 F.2d 1359.

3. The record before us indicates, without contradiction, that the no-show provision involved here was desired by the Government and was included with its affirmative approval, and also that defendant has been paying under similar clauses since the Civil Aeronautics Board granted an exemption (after the contract period in suit) covering the no-show provision. In addition, the plaintiff has filed uncontroverted affidavits showing the burden on it from the Government's failure to cancel reservations on time.