BRITISH CALEDONIAN AIRWAYS,
LIMITED, Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

Ford Employees Recreation Association, World Airways, Inc., Show of the Month Club International and Maritz Travel Company, Intervenors.

No. 75–1991.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 26, 1977.

Decided June 15, 1978.

As Amended June 23, July 19, and
Oct. 30, 1978.

Leonard N. Bebchick, Washington, D. C., with whom Allen L. Lear, Washington, D. C., was on the brief for petitioner and intervenor World Airways, Inc. Jerrold Scoutt, Jr., Washington, D. C., also entered an appearance for intervenor, World. Airways, Inc.

David E. Bass, Atty., Kansas City, Mo., C. A. B. with whom James C. Schultz, Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, C. A. B., and Carl D. Lawson, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondent.

Robert M. Hausman, Washington, D. C., for intervenor, Maritz Travel Co.

Herbert A. Rosenthal, Washington, D. C., entered an appearance for intervenors Ford Emp. Recreation Ass'n and Maritz Travel Co.

Fred M. Geldon, Washington, D. C., entered an appearance for intervenor SMCI.

Before Mr. Justice CLARK,* of the Supreme Court of the United States, and MacKINNON and ROBB, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

Petitioner here challenges a declaratory order of the Civil Aeronautics Board (the Board) issued under the authority of 5 U.S.C. § 554(e) (1976) to terminate a controversy and remove uncertainty.[1] The order. in question is attacked on both procedural and substantive grounds. Although no argument is made that the order was not issued pursuant to those procedures required for declaratory orders, petitioners assert that in issuing this order, the Board was in fact improperly promulgating a new legislative regulation for the airline industry without following the procedures prescribed for either formal or informal rulemaking which mandate, respectively, trial type procedures and an opportunity for notice and comment. Should this court find that the Board's use of a declaratory order was procedurally proper, petitioner further contends that the substance of this order is unreasonable and at variance with several recent court decisions. Our jurisdiction derives from 49 U.S.C. § 1486(a) (1970),[2] and we find petitioner's contentions without sufficient merit to persuade us to overturn the Board's order.

## I. FACTUAL SETTING

### A. The Cancellation Charges·

The petition for review involves a round trip charter flight booked on April 18, 1973 by Ford Employees Recreation Association (Ford) with World Airways (World), an American charter line. The charter contract, which provided for a firm departure date of December 28, 1973, also provided for a series of part payments due at fixed dates in advance of the flight, which payment would be forfeited if Ford cancelled the trip after the due date of the second advance payment, September 30, 1973. On November 13, 1973, some 44 days after the last day Ford could withdraw from the charter without suffering a forfeiture, World Airways informed Ford that the then existing international fuel crisis might make the flight impossible. Ford construed this asserted

---

* Mr. Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation pursuant to 28 U.S.C. § 294(a). Justice Clark heard oral argument but due to his death took no part in the final decision in this case.

1. 5 U.S.C. § 554(e) (1976) provides:
   (e) The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty.

2. (a) Any order, affirmative or negative, issued by the Board or Administrator under this chapter, except any order in respect of any foreign air carrier subject to the approval of the President as provided in section 1461 of this title, shall be subject to review by the courts ·of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order. After the expiration of said sixty days a petition may be filed only by leave of court upon a showing of reasonable grounds for failure to file the petition theretofore.

49 U.S.C. § 1486(a) (1970).

uncertainty concerning what previously had been an assured departure date as anticipatory repudiation, cancelled its flight, and requested refund of the $10,700 advance payments. World refused to return this sum on the grounds that the charter contract it had entered into with Ford specified that pre-flight installments were not refundable in the event of cancellation. The contractual question whether World had itself breached the charter agreement, however, is not before this court. The only issue with which we are confronted is the legitimacy *vel non* of the provision for the forfeiture of pre-flight payments in light of the fact that this forfeiture provision was not included in the tariff that World filed with the CAB as required by the applicable statute and regulations.

Petitioner British Caledonian Airways (Caledonian) is also involved in charter flight bookings, and follows a plan of advance payments and cancellation penalties generally similar to those of World. It also has petitioned to review the agency action (J.A. 94), contending that the declaratory order constitutes rulemaking and thus is invalid due to the Board's failure to follow rulemaking procedures (J.A. 199). Intervenors Show of the Month Club, International and Maritz Travel Company (Maritz) are other charterers of flights with World who suffered the forfeiture of steep cancellation charges in 1974 and 1975. In each case, the terms of the cancellation policy were clearly made known in the contracts signed by those chartering the flights and the airlines. The sole objection raised by the charterers is that the cancellation charges in question were not included in tariffs on file with the Civil Aeronautics Board.[3]

## B. *The Prior Industry Letter*

In July of 1974, a letter was sent from the Civil Aeronautics Board, Director of the Bureau of Economics and the Director of Operating Rights, to all passenger air carriers. Caledonian Airways claims not to have received a copy until November of 1974. World makes no such claim. The letter stated that many carriers were not conforming to the Board's requirements with respect to filing cancellation provisions included in charter contracts, (J.A. 93), and continued:

> We regard this as a very serious situation. Several carriers, particularly those operating ITC [inclusive tour] and TGC [travel group] charters, have already been advised that cancellation provisions should be included in their tariffs. We believe that this situation is sufficiently wide-spread to make the matter the subject of an industry letter.

Sections 207.4a, 208.32(a), 212.3(a), 214.-13(a) and 221.38(a)(2) of the Board's Economic Regulations provide that no air carrier shall perform any charter trip unless it has on file with the Board currently effective tariffs showing all rates, fares, and charges for the air transportation and showing all rules, regulations, practices, and services in connection with such air transportation. The provisions of these sections clearly require the inclusion of a carrier's charter cancellation provisions in its tariffs. Furthermore, sections 207.4a(b), 208.31(b), 212.3a(b) and 214.13a(b) provide that "no term or condition of the charter contract shall, on its face be inconsistent with any provision of the carrier's published tariffs." *The absence of charter cancellation provisions in a carrier's tariffs would in effect render*

---

**3.** Recently the Supreme Court addressed a case involving a fact situation that is somewhat related to that presented here. In *Nader v. Allegheny Airlines*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), the plaintiff sued for common law misrepresentation and violation of the statutory mandate against "unreasonable preference[s]" when he was denied boarding due to overbooking, despite the fact that he had what he considered to be a guaranteed reservation for a seat. The airlines' overbooking priority rules were set forth in the airlines' manual, as required by CAB regulations. 14 C.F.R. § 250.5 (1977). Plaintiff's successful judgment on the common law count was sustained by the Supreme Court. Here, on the other hand, it appears that petitioner would have a good defense against any common-law action by Ford or other travel groups, as the cancellation charges in question were explicitly contained in the contract between the charterers and the airlines.

*the cancellation provisions of the charter contract inconsistent with the carrier's tariffs.* Thus, the inclusion of cancellation provisions in a carrier's charter contract, which conflict with the cancellation provisions in a carrier's published tariff, would be a direct violation of the Board's rules. Likewise, we would view the charging of charter cancellation fees which are not contained in a carrier's tariffs to be a violation of section 403 of the Act [49 U.S.C. § 1373 (1970)]. Under these circumstances, all carriers should take immediate steps to include appropriate charter cancellation provisions in their tariffs. *All such provisions must be deleted from carrier's charter contracts unless and until included in their tariffs.*

(J.A. 93) (Emphasis added).

This CAB letter to the industry was precise and definite. It was presented as a statement of the then-existing agency law, not as a declaration of a new regulation. World and Caledonian considered it to be no more than a non-binding advisory notice. On May 9, 1975, Ford, supported by the other two charterer-intervenors here (Show of the Month and Maritz), petitioned the Board to issue a declaratory order [4] stating that the Federal Aviation Act and the Board's regulations required the inclusion of charter cancellation charges in filed tariffs.[5] Notice of this petition was sent to all certified U.S. air carriers, both those offering scheduled service and those offering supplemental charter flights. Responses were received by the Board from World,

Caledonian and one other supplemental charter line not a party here.

On September 30, 1975, the CAB issued its Declaratory Order 75–9–114, which is the subject of this appeal. The order generally reaffirmed the industry letter, and by way of interpretation stated "[t]hat § 403 of the Federal Aviation Act and the Board's regulations require all carriers performing charters to include in their tariffs . . . all provisions relating to penalties, forfeitures, or liquidated damages for the cancellation of charter flights . . . ." (Order No. 75–9–114 at 6, J.A. 92).[6] It also denied Ford's request for further declaration relating specifically to its contract with World (*Id.*). Petitioners World and Caledonian seek review of Order 75–9–114 in this court, pursuant to 49 U.S.C. § 1486(a) (1970).[7]

## II. THE APPROPRIATENESS OF A DECLARATORY ORDER AS OPPOSED TO FORMAL OR INFORMAL RULE-MAKING

### A. Rulemaking as the Alleged Prior Practice of the Board

■ Essentially, petitioners' procedural argument is that the Board in its declaratory order has not removed an uncertainty as authorized by 5 U.S.C. § 554(e) (1970),[8] but instead has created a new substantive rule (Brief for Petitioner and Intervenor World 27–31). They also contend that the inclusion of charter cancellation fees in airline tariffs is a departure from long-standing

---

**4.** See note 1 *supra.*

**5.** Ford also requested a declaration that World was unlawfully withholding $10,700 in advance payments from Ford, and that the provision in the Ford-World contract under which the funds were retained was unenforceable. The Board refused to grant this additional relief because it concerned the merits of one specific case and went beyond the general needs of the industry.

**6.** 1. That § 403 of the Federal Aviation Act and the Board's Regulations require all carriers performing charters to include in their tariffs on file with the Civil Aeronautics Board all provisions relating to penalties, forfeitures, or liquidated damages for the cancellation of charter flights by charterers;

2. That the charging, demanding, collecting, or receiving of charter cancellation penalties, forfeitures, or liquidated damages by a carrier which does not have such cancellation penalties, forfeitures, or liquidated damages in its applicable tariff is a violation of § 403 of the Act and Board's Regulations thereunder;

3. That during the period from April to December 1973, World Airways had no provision in its tariffs with respect to cancellations by charterers and the penalties, forfeitures or liquidated damages therefor.

(J.A. 92).

**7.** See note 2 *supra.*

**8.** See note 1 *supra.*

Board practices, and that this "novel" policy can only properly be established through a rulemaking rather than an adjudicatory proceeding (Brief for Petitioner and Intervenor World 10–13, 20–26). We find both these arguments to be without merit. Even if there had been a deviation from prior agency decisions or practices the order here challenged would still be valid as agencies may alter their rulings if a change in policy would further the accomplishment of their administrative responsibilities,[9] and an estoppel—preventing the alteration of prior practices as regards certain parties—will only be worked against the government for compelling equitable considerations.[10] Previous CAB practice will only be determinative here if it had been such as to have created a pattern of behavior on which industry members justifiably had come to rely. To prove the existence of such established pattern the petitioner must bear a heavy burden, and we find that they clearly have not approached discharging it in this case.

Petitioner offers examples of instances in which, in amending the tariff requirements, the Board has proceeded by rulemaking. These cases, it is maintained, demonstrate that carriers could justifiably expect *all* tariff requirements to be announced by rulemaking. None of the examples offered, however, lend any significant support to petitioner's position.

The rules adduced as examples cover (1) credit practices,[11] (2) charges for late payment of bills,[12] (3) provisions for compensating ticketed passengers who are denied boarding,[13] (4) charges for in-flight movies and alcoholic beverage service,[14] and (5) seating configurations.[15] Concerning the latter two regulations, there was considerable doubt—in contradistinction to the cancellation charges that are the subject of the instant declaratory order—whether the extant regulatory scheme could be said already to require the filing of the specific information there involved. In-flight movies, alcoholic beverages, and seating configuration are all elements in the general group of services included within the value purchased with an airline ticket; to single them out for itemized charge (movies and beverages) or detailed specification (seating configuration) goes beyond what could credibly be considered an "interpretation" of the generic term, "all charges . . . for air transportation." As regards these matters the statutes and regulations were undeniably lacking in specificity concerning whether or not such information had to be filed in the airlines' tariffs, and the Board may well have thought that requiring its inclusion was a sufficiently "novel" requirement that rulemaking was appropriate.

It is, however, of little significance to this case that the Board in the past has utilized rulemaking to amend its tariff regulations to compel inclusion of items *not manifestly covered by the general filing requirements.* These requirements mandate the filing of

---

**9.** *See, e. g., NLRB v. Weingarten, Inc.,* 420 U.S. 251, 265–67, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975); *Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 184–88, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973); *Mountain States Telephone and Telegraph Co. v. United States,* 499 F.2d 611, 615, 204 Ct.Cl. 521, (1974); *Pennsylvania Water & Power Co. v. FPC,* 74 App.D.C. 351, 123 F.2d 155 (1941), *cert. denied,* 315 U.S. 806, 62 S.Ct. 640, 86 L.Ed. 1205 (1942); 2 Davis, *Administrative Law Treatise* § 17.07 at 525–530 (1958). Moreover, a reversal of prior practice may legitimately be deemed an "interpretation" rather than a promulgation of a new rule. *See* Davis, *Administrative Law Treatise* § 5.01 at 245 (Supp.1970).

**10.** *See Bentex Pharmaceuticals, Inc. v. Richardson,* 463 F.2d 363 (4th Cir. 1972), *rev'd on other grounds,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); Davis, *Administrative Law in the Seventies* § 17.04 (1976).

**11.** 14 C.F.R. § 221.38(i) (ER–451, 31 Fed.Reg. 2424, February 5, 1966).

**12.** 14 C.F.R. § 221.38(i) (ER–253, 27 Fed.Reg. 450, May 11, 1962).

**13.** 14 C.F.R. § 221.38(a) (ER–503 & 504, 32 Fed.Reg. 11938–11939, August 18, 1967).

**14.** 14 C.F.R. § 221.38(a)(8), (9) (ER–529, 33 Fed.Reg. 4456–4459, March 13, 1968, repealed, ER–795, 39 Fed.Reg. 9222, April 12, 1973).

**15.** 15 C.F.R. § 221.38(a)(6) (ER–338, 26 Fed. Reg. 9310, October 3, 1961).

"[a]ll terms, conditions, or other provisions which affect the rates, fares or charges for air transportation named in the tariff" and "[a]ll other provisions and charges which in any way increase or decrease the amount to be paid . . . by any charterer or which in any way increase or decrease the value of the services rendered to the charterer." (14 C.F.R. 221.38(a)(2), (4)). We find that cancellation charges were plainly encompassed within the language of the statutes and regulations governing tariff disclosures.

The degree of clarity of the regulatory mandate requiring the filing of cancellation charges is sufficiently distinguishable from the statute and regulations relating to the filing of charges for in-flight movies and for seating configurations so that the procedures the Board adopted for dealing with the latter are not compelling authority for its treatment of the former. While rulemaking might well be advisable, or even required, when mandating the filing of information not plainly within the comprehension of extant statutes and regulations, the Board was well within the bounds of procedural propriety in using a declaratory order to remind the airlines of their obligation to file cancellation charges, see *Yale Broadcasting Co. v. FCC*, 155 U.S.App.D.C. 390, 478 F.2d 594, 599–601 (1973).

Petitioner's first three examples of instances in which the Board has proceeded by rulemaking to amend tariff filing requirements, however, are like cancellation charges in that they fall clearly within the regulatory language. It would be hard to say that the Board was only "reminding" the carriers of their obligation to file their cancellation charges but was establishing a novel regulation in requiring the filing of these three types of information. The procedures used to deal with the credit practices, charges for late payments, and compensation for passengers denied boarding are, then, arguably pertinent to those procedures which the Board should—in light of its prior practice—have used in dealing with cancellation charges. Upon inspection, however, it is apparent that the former procedures by no means indicate that the CAB should have utilized rulemaking in the instant case.

In regard to the provisions concerning compensation for "overbooking," it appears that such provisions were in fact required to be filed as tariff information *before* adoption of the regulations so providing, 14 C.F.R. 221.38 and 14 C.F.R. Part 250, see Air Bus Tariffs Investigation, 39 C.A.B. 142 (1963); Domestic Trunklines, Tariff Agreement, 35 C.A.B. 881, 886 (1962). Thus, the practice of the Board in dealing with such charges by regulatory rules does not indicate that it must promulgate rules, either formal or informal, *before* stating in a declaratory order that cancellation charges must be filed in tariffs. Indeed, if anything, the Board's handling of the rule on denied boarding compensation suggests that the CAB was not required to engage in rulemaking, as opposed to declaratory order proceedings, in order to interpret its statutes and regulations with respect to cancellation charges as it did in the declaratory order.

With respect to the obligation to file information on credit practices and terms, petitioner cites *Universal Air Travel Plan,* 12 C.A.B. 601 (1951). Initially this case took the form of a CAB opinion which stated in general terms that credit practices were required to be filed in tariffs. That opinion was followed fourteen years later by a formal rule on the same subject that included a filing requirement to the same effect (14 C.F.R. 221.38(i)). The fact that a regulation was finally issued after a long hiatus does not, however, support petitioners' argument that the promulgation of a new rule was *required* here, or that the earlier opinion was procedurally improper. When the credit regulation finally was issued, it required great specificity of disclosure, and it was the amount of detail that was being required which made rulemaking appropriate. The 1951 opinion established the broad principle that credit charges should be in tariffs; but it was only in 1966 that the Board specified the required detail of disclosure. The following language from the 1951 adjudication is instructive as to the

generality of the original obligation to file credit charges in tariffs:

> [B]oth legal requirements and public interest considerations lead us to conclude that the *basic feature* of the plan should be filed as a tariff insofar as air transportation within the meaning of the Act is involved. . . . The minor details, which are those which will most frequently undergo change, can be left to a manual as at present with appropriate reference to such manual in the tariff.

12 C.A.B. at 604 (emphasis added). Hence, while it was part of a carrier's obligation—on the authority of an adjudication, not rulemaking—from before 1951 until 1966 to file the essential features of its credit charges in its tariff, disclosure of the minute details of those credit plans was not required until the 1966 rule became effective. The declaratory order here in question, like the 1951 CAB opinion, does not set forth any elaborate scheme establishing what constitutes adequate disclosure. The credit charge example, thus, in no way suggests that the Board should resort to rulemaking procedures in order to interpret the statutes and regulations as requiring that cancellation charges be included in filed tariffs. When the Board feels it is necessary to establish a detailed scheme for the filing of cancellation charges, perhaps it will indeed find need to rely on substantive rulemaking (and there is no indication in past practice that it would not do so); but there is nothing in Board practice at this stage which indicates that rulemaking, either formal or informal, is customary Board procedure in all circumstances such as those involved in the instant declaratory order.

Petitioner has failed to establish that the prior practices of the CAB were such that it could justifiably expect that some sort of rulemaking proceedings would be followed whenever a tariff inclusion order was issued. To do so would have required an extremely strong showing in light of the strong policy which favors allowing agencies considerable flexibility even when altering their prior practices. *See* pages ———–——— of 190 U.S.App.D.C., pages 985–986 of 584 F.2d, *supra.* Moreover, clearly cutting against petitioner's argument is the fact that the Board from time to time has entered orders finding that certain carriers by failing to include such items as oversales liability rules, live animal rules, and freight packing and marking conditions in their tariffs had violated the Act and its implementing regulations.[16] Such decisions clearly have the effect of compelling the inclusion of these items in airlines' tariffs when the required filing of such information had been allegedly unclear before the order. In light of such history of interpreting the scope of tariff inclusions by non-rulemaking proceedings, it is unfounded for petitioner to contend that it could legitimately expect to rely on rulemaking whenever tariff requirements were affected; in other words, Caledonian had no justification to expect that the applicable statutes and regulations would never be so interpreted by declaratory orders.

### B. *Not Filing Cancellation Charges as the Alleged Prior Practice of the Board*

Petitioner's contention that the Board's prior practices have sanctioned the substantive policy of not filing cancellation charges is no more persuasive than its assertion that the Board's previous procedural practices required rulemaking whenever tariff requirements were altered. The short answer to the claim that the Board has acquiesced for twenty years in the non-filing of cancellation charges (and thus is allegedly required to continue to do so), is that the premise for such conclusion is simply not true. The respondent points out that as early as 1962, the Board in Order E–18224, 36 C.A.B. 33, 43 n. 14 (1962), specifically required that limitations on refunds in the

---

16. *See, e. g.,* 35 C.A.B. 881, 883 n. 2 (1962) (oversales liability rules); Order 73–6–103, at 42, June 26, 1973 (rules concerning transportation of live animals); Order 4–1–109, January 22, 1974 (charter passenger re-routing provisions); Order 75–9–27, September 11, 1975 (live animal rules); Order 76–3–139, at 56, March 22, 1976 (freight packing and marking conditions).

event of cancellation be included in tariff filings. Moreover, a number of carriers were in the practice of filing their cancellation charges in their tariffs,[17] and the Board had issued orders suspending some of the tariffs filed by charter carriers pending an examination of the reasonableness of the cancellation charges so listed (Respondent's brief at 13). It may, of course, be true that a number of tariffs were filed which did not in fact include cancellation charges, but a much stronger showing than this would be necessary to establish, as the petitioner asserts, that the "prior agency practice" *condoned* such omissions. That some tariffs did not contain information on cancellation charges while others did, points to exactly that sort of "uncertainty" in the interpretation of the law, by those subject to it, which declaratory orders are explicitly authorized to remove under the terms of 5 U.S.C. § 554(e), *supra*. Far from demonstrating that the Board should be estopped by its previous practice, petitioner has, in this respect, only underscored the appropriateness of the very CAB procedures which it attempts to have invalidated. If rulemaking is not required by the Administrative Procedure Act, it certainly is not necessitated by the prior practice of the Board.

C. *The Use of a Declaratory Order as Opposed to Formal or Informal Rulemaking and the Requirements of the Administrative Procedure Act*

   1. The Declaratory Order as an Interpretative Ruling

The petitioner earnestly contends that because the declaratory order of the Board will have a significant effect on the entire airline industry that rulemaking is mandated by the terms of the Administrative Procedure Act (Brief for Petitioner and Intervenor at 27–31). But such result would not be required even for an *interpretative rule,* and the *declaratory order* we are dealing

with here is even further removed from rulemaking requirements. Merely because a *rule* has a wide-ranging effect does not mean that it is "legislative" rather than "interpretative." *American President Lines v. Federal Maritime Commission,* 114 U.S.App.D.C. 418, 316 F.2d 419, 422 (1963), written by Chief Justice Burger, then a judge of this court, held that even though an *interpretative rule* "may have some pragmatic consequences . . . its legal effect is essentially that of an opinion of the legal staff [footnote omitted]." "Adjudicated cases may and do, of course, serve as vehicles for the formulation of agency policies, which are applied and announced therein," *NLRB v. Wyman Gordon Co.,* 394 U.S. 759, 765, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709 (1969); see *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–95, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); Friendly, *The Federal Administrative Agencies* 36–52 (1962). Following *National Motor Freight Traffic Ass'n v. United States,* 268 F.Supp. 90 (D.D.C.1967), *aff'd,* 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968), a number of courts have required that notice and comment procedures must be used whenever a rule has a "substantial impact," *e. g., Noel v. Chapman,* 508 F.2d 1023 (2d Cir. 1975); *American Bancorporation, Inc. v. Bd. of Governors of the Federal Reserve System,* 509 F.2d 29 (8th Cir. 1974); *Texaco, Inc. v. FPC,* 412 F.2d 740 (3d Cir. 1969). However, even if the instant order were to be treated as an interpretative rule, petitioners have misinterpreted the impact of the order. "Generally these courts [those courts which have adopted the "substantial impact" test] have found the requisite substantial impact where the challenged rule involved the creation of new rights and obligations, thereby transforming procedure into substance." 3 Menzines, Stein, Gruff, Administrative Law 18–20, 18–21 (1977) (citing the cases mentioned in this paragraph). In the case of

---

**17.** The following United States airlines had tariffs including cancellation charges on file as of March, 1975. Regularly scheduled carriers: Pan American, United, American, Eastern, Northwest, Braniff, and TWA; supplemental carriers: Capitol International Overseas National, and Trans International. *See* Brief of Intervenor Maritz Travel Co. at 14. It is also significant that only Caledonian and World, from among all foreign and domestic, regularly scheduled and supplemental carriers, chose to challenge the CAB's Order 75–9–114.

the order here in question, however, the Board has expressly *not* created new rights and obligations, but at most only clarified those already extant without any change in the content of the relevant language. That this order has some effect—it would be frivolous if it did not—does not under the "substantial impact" doctrine require that it be promulgated through rulemaking procedures.

The feature which distinguishes declaratory orders and other interpretative rulings from those legislative rules which must conform with the procedures established by the APA for rulemaking is not the extent of their effect, but rather that the order or ruling instead of creating new law serves only to clarify and state an agency's interpretation of an existing statute or regulation. *Gibson Wine Co. v. Snyder,* 90 U.S. App.D.C. 135, 194 F.2d 329, 331 (1952); *Continental Oil Co. v. Burns,* 317 F.Supp. 194, 197 (D.Del.1970); *see generally,* Schwartz, *Administrative Law* 154 (1976). All one need do is examine the regulatory and statutory scheme under which the declaratory order here in question was issued in order to perceive that it was plainly interpretative and explanatory rather than legislative.

The statute involved here states:

Every air carrier and every foreign air carrier shall file with the Board, and print and keep open to public inspection, tariffs showing all rates, fares, and charges for air transportation between points served by it . . . and *showing to the extent required by regulations of the Board,* all classifications, rules, regulations, *practices,* and *services in connection with such air transportation.*

49 U.S.C. § 1373(a) (1970). In addition several Board regulations promulgated under the above quoted statutory authority are relevant, each of which also uses the operative phrase "all rates, fares, [and] charges [for various services]" in describing what must be included in a tariff. 14 C.F.R. §§ 207.4,[18] 208.32, 212.3,[19] 214.13 (1976). Furthermore, the Board's regulation, 14 C.F.R. § 221.38 (1976) also requires:

(a) [T]he rules and regulations of each tariff shall contain . . .

(2) *All of the terms, considerations, or other provisions which affect the rates, fares, or charges for air transportation named in the tariff.* . . .

(4) All other provisions and charges which in any way increase or decrease the amount to be paid on any shipment or by any passenger or *by any charterer* or *which in any way increase or decrease the value of the services rendered to the shipment or passenger or charterer.* . . . (Emphasis added).

Manifestly, the Board in the declaratory order here challenged has declared under the law and regulations that one type of charge—the cancellation charge—is included as one of "the terms, conditions, or other provisions which *affect* the rates, fares, for air transportation." It is undoubted that the advance payments were "charges for air transportation," and the provision for their forfeiture on cancellation of the charter party obviously "*affects*" that "charge," *i.*

---

18. (a) No air carrier shall perform any charter trips or other special services unless such air carrier shall have on file with the Board a currently effective tariff showing all rates, fares, and *charges for such charter trips* and other special services, and showing the rules, regulations, practices, and services in connection with such transportation including the eligibility requirements for charter groups not inconsistent with those established in this part.

14 C.F.R. § 207.4 (emphasis added). The advance payments required for reservations are obviously "charges for charter trips . . ." and the provision for forfeiture of such payments in event of cancellation by the charterer is an important part of such charge.

19. (a) No foreign air carrier shall perform any charter trips unless such foreign air carriers shall have on file with the Board a currently effective tariff showing all rates, fares, and charges for such charter trips, and showing the rules, regulations, practices, and services in connection with such transportation, including eligibility requirements for charter groups not inconsistent with those established in this part.

14 C.F.R. § 212.3(a). As with § 207.4, *supra* note 18, the inclusion of "cancellation charges" is obvious.

e., it forfeits it entirely to the airline. Thus (a)(2) unquestionably requires the inclusion of the cancellation charge in the tariff. This analysis by itself is sufficient to sustain the order of the Board.

There are, moreover, at least two other justifications for the Board's interpretation. With reference to (a)(4), it can also be said that the provision for forfeiture of the advance payment constitutes a "[provision] . . . which . . . [increases] . . the amount to be paid . . . by any charter." The charterer pays the forfeiture if he cancels the flight whereas if the flight is not cancelled the money pays part of the fare.

Finally, with respect to the last clause of (a)(4), a stipulation in a charter contract stating that on deposit of a partial advance payment the charterer will obtain a firm reservation of a specific type plane for a definite flight on fixed dates constitutes a "provision . . . which . . . increase[s] . . . the value of the services rendered to the . . . charterer." The reservation is a service of benefit and value to all putative passengers in that they are thereby enabled to plan in advance on a definite schedule, and the charterer benefits since the reservation service to the passengers increases the attractiveness of his flights. Conversely, it might also be said in certain instances that the provision authorizing the *forfeiture* of the advance payment also operates to "decrease . . . the *value* of the reservation services rendered to the charterer," by imposing the risk of such a substantial charge in the event the charterer cancels the flight. It is thus apparent that the Board's interpretation had not one, but several reasonable bases, and one alone is sufficient for a court to sustain it.

The process here engaged in by the Board in issuing the declaratory order was that of construing the language and intent of the existing statute and regulations in order to determine whether they encompass cancellation charges; not that of assessing whether the purposes of the Act and regulatory scheme (none of which is challenged here) would favor an inclusion of such charges in airline tariffs. Such interpretation to remove uncertainty is a function peculiarly within the ability and expertise of the agency. *See Magruder v. Washington B. & A. Realty Corp.,* 316 U.S. 69, 62 S.Ct. 922, 86 L.Ed. 1278 (1942). The Board's order does not establish new controls pursuant to its authority under the Act, but rather only explains what the extant statutory-regulatory system entails with respect to a single item. This is, by its very nature a declaratory interpretation, not a legislative-type promulgation. We have recently held that an agency need not resort to rulemaking proceedings to interpret a statute or regulation and thereby remind its regulatees of the content of their obligations, even if in so doing an arguably new obligation is imposed upon them, *Yale Broadcasting Co. v. FCC, supra.*

We do not advocate the overly simplistic position that merely because a regulation "explains" another regulation or statute it is *ipso facto* "interpretative" rather than "legislative." In implementing an act or regulation through "explanations," an agency obviously could change the substantive effect of such provisions significantly. It is crucial to our decision of this case that we do not regard the declaratory order in question as in any way a further "implementation" of the Act or regulation (whether by "explanation" or "legislation"), but rather as the CAB's view as to what the existing statute and regulations are properly understood to involve in one respect. Such explanations whether or not they have significant practical effects are properly characterized as interpretative action.

D. *The Characterization of the Declaratory Order by the Board*

Looking at the order in question and comparing it with the statutes and regulations which it in part elucidates—regardless of any statement from the Board as to the interpretative or legislative nature of its ruling—we find, following the rationale elaborated above, that this determination is interpretative of existing law and regula-

tions and thus was properly issued as a declaratory order.

■ In the present case we have, moreover, the Board's own assertion that its order is purely interpretative, and this contention in itself is entitled to a significant degree of credence. In the analogous situation of trying to determine whether a rule promulgated by an agency is legislative or interpretative, the agency's views are generally given deference, and we see no reason not to accept the Board's view that its decision in this case was of the latter variety. Professor Davis recognizes that an agency with power to make both substantive rules and interpretative rules "necessarily has authority to determine which kind it is making . . . The crucial question is whether the agency intends to exercise delegated power to make rules having force of law, and the intent usually can best be found in what the agency says at the time of issuing the rules." K. Davis, Administrative Law in the Seventies § 5.03 at 148 (1976). While declaratory orders differ in some respects from interpretative rules, the same rationale should apply equally to an agency's characterization of one of its rulings as a declaratory order, see *Pacific Gas & Electric Co. v. Federal Power Commission,* 164 U.S.App.D.C. 371, 506 F.2d 33, 39 (1974).

In this case, the Board has announced its interpretation as to the application of extant statutes and regulations. In doing so it has affirmed the validity of the interpretation set forth in the letter sent to the air carriers by its staff some 14 months prior to the instant declaratory order. Of course, petitioner may, and does, challenge the rea-

sonableness of the Board's order,[20] and we deal with this facet of the case below. At this point, it suffices to state that the order in question is what the agency states it is and that it should be given its *prima facie* effect, i. e., as a declaratory interpretation of certain terms in the statutes and regulations. The question before the Board was whether the cancellation charges imposed by World Airways were covered by section 403 of the Federal Aviation Act and the Board's Regulations. The Board in deciding that they were did not carry into effect any new policy of its own or any new method of implementing congressional intent. It did no more than declare its interpretation of the meaning of "charges" and "value of the services rendered," in the statutory and regulatory context in which those terms are operative.

E. *The Discretion of the Board to Elect Between a Declaratory Order and Rulemaking*

■ Not only has petitioner failed to persuade the court that the deference traditionally extended to any agency's characterization of the nature of its own rules is out of place in this case, but also Caledonian has inadequately appreciated the discretion allowed agencies in determining whether to proceed by interpretative or legislative action. Despite the perennial plaint that agencies violate the Administrative Procedure Act when they formulate broadly applicable policies in the context of adjudicatory proceedings,[21] there is no serious question that "one of the most distinctive aspects of the administrative process . . [is] the flexibility it affords in the selection of methods of policy formulation," Shapiro,

---

**20.** The Board's declaratory order, being interpretative, is more subject to invalidation than a legislative rule of the agency would be—compare *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) and *Brewster v. Gage,* 280 U.S. 327, 336, 50 S.Ct. 115, 74 L.Ed. 457 (1930); see Schwarz, Administrative Law 155 (1976) and *infra,* page —— of 190 U.S.App.D.C., page 994 of 584 F.2d. Stricter review of the substance of interpretative orders is the quid pro quo for the more lax procedural standards under which they may be issued. *See* Schwarz, op. cit. at 154–55.

**21.** *See* Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy,* 78 Harv.L.Rev. 921, 927 n. 21 (1965); Proceedings of the House of Delegates, 44 A.B.A.J. 1062, 1112 (1958); cf. Peck, *The Atrophied Rulemaking Powers of the NLRB,* 70 Yale L.J. 729, 754–55 (1961), and the preference that some courts have shown for having such policies established through rulemaking, see, e. g., *Bell Telephone Co. of Pennsylvania v. FCC,* 503 F.2d 1250, 1265 (3d Cir. 1974).

The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. at 921 (1965), and that "the choice made between proceeding by a general rule or by individual ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." [22]

In order for this court to hold that an agency's election to act by a declaratory order, in response to a petition therefor, is invalid, it must find that in choosing such a procedure, the agency abused its discretion, NLRB v. Bell Aerospace Co., 416 U.S. 267, 295, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). We find no basis for any such finding in this case. Presented with a petition for a declaratory order to illuminate the meaning of its regulations, in light of its interpretation of the applicable statute, the CAB's use of such order is not only not abusive, but is particularly appropriate. We have expressly held that "an interpretation of . . . regulations by . . . declaratory ruling . . . [is] well within the scope of the familiar power of an agency to interpret the regulations within the framework of an adjudicatory proceeding." [23]    As demon-

**22.** SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); NLRB v. Savair Mfg. Co., 414 U.S. 270, 290, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973) (White, J., dissenting); NLRB v. Waterman S.S. Co., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed. 704 (1940); Alianza Federal de Mercedes v. FCC, 539 F.2d 732, 738 (D.C.Cir.1976); Robinson, The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform, 118 U.Pa.L.Rev. 485, 508 (1970).

**23.** Trans International Airlines, Inc. v. CAB, 139 U.S.App.D.C. 174, 432 F.2d 607, 612 n. 9 (1970); see Chisholm v. FCC, 176 U.S.App.D.C. 1, 538 F.2d 349, 365, cert. denied, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976). As we noted in Chisholm: "The declaratory ruling belongs to the genre of adjudicatory rulings." 538 F.2d at 364 n. 30. A public official charged with the duty of administering a regulatory statute has inherent authority to issue advisory or declaratory decisions defining obligations under the statute even though the express or implied terms of the statute do not so provide, see e. g., Electrolux Corp. v. Miller, 286 N.Y.S. 390, 36 N.E.2d 633 (1941). A declaratory order is any order issued by an agency or staff member at a sufficiently high level, that has sufficient formality, that does not coerce, and that has sufficient binding effect to be judicially reviewable. K. Davis, Administrative Law Case Book 530 (6th ed. 1977). In Red Lion a declaratory ruling was issued by the FCC after an exchange of letters and without a hearing. It terminated a controversy between a broadcast station and the subject of a radio attack, and the court held the order to be authorized by statute and constitutional. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 372 n. 3, 375, 386, 401, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). It also appears that the Federal Communications Commission did not hold a hearing when it issued its declaratory order on the basis of petitions, lengthy comments and extensive opposition documents in Chisholm v. FCC, supra at 365 & n. 32. In so doing it acted "to inter-

pret a statute . . . ." 538 F.2d at 366 n. 34. In First Savings & Loan Assn. of the Bahamas, Ltd. v. SEC, 358 F.2d 358 (5th Cir. 1966), the Fifth Circuit stated with respect to the Securities and Exchange Commission that a declaratory order may be issued in response to a "written motion or application, accompanied by a supporting brief filed with the Secretary or other duly authorized officer of the Commission, [requesting] the Commission to issue a declaratory order [to interpret a particular section of the regulatory act] . . . ." 358 F.2d at 360.

However, where an interpretation of a written document depended in part upon the determination of contested facts, an evidentiary hearing is required. Alaska Airlines, Inc. v. CAB, 178 U.S.App.D.C. 116, 545 F.2d 194 (1976). In such circumstances the applicable federal statute and due process so require. The introductory clause to the APA section on "Adjudications," 5 U.S.C. § 554(a) provides:

This section applies, according to the provisions thereof, in every case of adjudication *required by statute* to be determined on the record after opportunity for an agency hearing . . . . (Emphasis added.)

The Civil Aeronautics Act does not require declaratory orders in the circumstances here involved to be determined on the record after an opportunity for an agency hearing. 49 U.S.C. § 1482, referred to by World, does not require a hearing here. The instant order is merely declaratory of the Commission's interpretation of the statute and regulations, does not adjudge a law violation, is not compulsive, and does not attempt to determine that any rate, fare, or charge is "unjust . . . unreasonable . . . unjustly discriminatory, or unduly preferential, or unduly prejudicial . . . ." Professor Davis has also noted in the context of the Interstate Commerce Act:

The ICC is tacitly assuming power to issue declaratory orders under § 5(d) [currently § 5(e); cf. 60 Stat. 240, 80 Stat. 385] irrespective of the limitations stated in the introduc-

strated above, the order here was clearly interpretative. It did not determine that Petitioner, or any other carrier, had committed any violation; it merely explained the scope of an extant regulation. The Board did no more than exercise the authority of all agencies as recognized in the adjudication provisions of the Administrative Procedure Act, "in its sound discretion . . . [to] . . . issue a declaratory order to terminate a controversy or remove uncertainty." (5 U.S.C. § 554(e)).

That the result of the Board's adjudication will have wide-ranging application in the future is, if not irrelevant, certainly not dispositive of the question of whether the agency abused its discretion in opting for adjudication rather than rulemaking:

> The choice whether to proceed by rulemaking or adjudication is primarily for the agency regardless of whether the decision may affect policy and have general prospective application.[24]

There are good reasons for an agency to choose to announce its policies through adjudications rather than rules. For example, the greater freedom with which the agency is able to disregard the former rather than the latter should future circumstances make such a course advisable, see Shapiro, supra,

78 Harv.L.Rev. at 947. It is thus not for this court to "second-guess" the CAB's decision to utilize adjudication rather than rulemaking.

None of the cases in which courts have refused to allow rulemaking to be entirely displaced by adjudicative processes[25] support such a drastic curtailment of agency discretion to elect either adjudicatory or rulemaking procedures as would be necessary for petitioner's position to prevail in this case.[26] Nothing in the APA required it to do so.

We thus conclude that neither the dictates of the APA nor the prior practices of the Board compelled it to follow rulemaking procedures in its declaration that charter cancellation charges must be included in airline tariffs.[27]

## III. THE REASONABLENESS OF THE DECLARATORY ORDER

(a) *General Conformity of the Order to the Statute and Regulations*

■ Having determined that the declaratory order in question is not invalid due to procedural defects, the reasonableness of the order is, of course, still open to review in this court, and is vigorously challenged

tory clause of § 5, and the Supreme Court is tacitly approving. Neither the Court nor the Commission has shown any concern for the limitations in the introductory clause [§ 5(a)]. The result, from a practical standpoint, is sound, because the declaratory-order power is needed and useful, and the limitations in the introductory clause were not drafted with declaratory orders in mind.
K. Davis, *Administrative Law Treatise* § 4.10, p. 201 (Supp.1970).

24. *Chisholm v. FCC, supra* note 23, 538 F.2d at 365 (citing *NLRB v. Bell Aerospace, supra*, 416 U.S. at 291–95, 94 S.Ct. 1757); see *American President Lines v. Federal Maritime Commission,* 114 U.S.App.D.C. 418, 316 F.2d 419, 422 (1963); 1 Davis, *Administrative Law Treatise* § 5.01 at 288 (1958).

25. *E. g., NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478 (2d Cir. 1972).

26. See Robinson, *The Making of Administrative Policy: Another Look at Rulemaking and*

*Adjudication and Administrative Procedure Reform,* 118 U.P.L.Rev. 485, 510–13 (1970). The CAB might, of course, have chosen to use rulemaking in this case, see *FPC v. Texaco, Inc.,* 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).

27. The procedures followed conformed to the requirements for declaratory orders. All parties had notice and fully presented their position to the Board. Ford had petitioned for such an order (J.A. 1–37); World Airways and all certificated air carriers were duly served by mail (J.A. 31); World Airways and other interested parties filed answers which fully submitted their legal arguments (J.A. 38–71, 82–86) and after full submissions by the parties the Board issued its declaratory order (J.A. 87–93). Thereafter there were a number of petitions for review and reconsideration and relevant pleadings and orders with respect thereto and these were duly passed on by the Board (J.A. 94–218).

by World and Caledonian. A declaratory order interpreting the law and regulations is not entitled to the same deference as a legislative rule, *e. g., Shell Oil Co. v. FPC,* 491 F.2d 82 (5th Cir. 1974); *O'Neill v. United States,* 281 F.Supp. 359 (D.C.Ohio), aff'd, 410 F.2d 888 (6th Cir. 1969); 1 Davis, *Administrative Law Treatise* § 5.03 (1958). A court, however, cannot merely substitute its own judgment for that of the Board, but must uphold an agency's interpretation of its own regulations if they are reasonable, *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945):

> [I]nterpretations and opinions of the Administrator under this Act [The Fair Labor Standards Act], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).[28]

In this case following the analysis set forth at pages ―― ·to ―― of 190 U.S. App.D.C., at pages 990 to 991 of 584 F.2d, *supra,* we see no reason why the Board's interpretation should not control for the reasons set forth in its declaratory order. No matter how persuasively petitioners might urge the *desirability* of maintaining flexibility by keeping cancellation charges out of tariffs, that argument, addressed to the Board as a policy-maker, by no means *indicates that the Board's interpretation of 14 C.F.R. § 221.38(a)(4) as encompassing such charges is invalid or unreasonable.* Petitioner's policy position may well be more desirable than the Board's, but

such arguments should be addressed to the Board itself, or to Congress, not to this court, and they do not indicate unreasonableness or lack of authority on the Board's part. For purposes of disposing of this petition it is sufficient that charging for reservations of charter flights by requiring advance payments and forfeiture of such payments if the charter is cancelled, clearly constitute "*practices* and *services* in connection with . . . air transportation." 49 U.S.C. § 1373(a) (1970) (emphasis added). By statute, such "practices" and "services" must be filed with the Board if "required by regulations of the Board." The Board's regulations do so provide: 14 C.F.R. § 221.-38(a)(4), page ―― of 190 U.S.App.D.C., page 990 of 584 F.2d *supra;* and section 221.38(e) requires: "Where a rule provides a charge in the nature of a penalty, the rule shall state the exact conditions under which such charge will be imposed."

### (b) *Previous Judicial Opinions*

We recognize that this decision arrives at a different result than that reached in *Iberia Airline of Spain v. Nationwide Leisure Corp.,* 408 F.Supp. 221 (E.D.N.Y.1976) and *McCulloch International Airlines v. Anne Storch International,* 13 Av.Cas. 17,562 (S.D.N.Y.1975). The CAB also recognized that *McCulloch* held contrary to the order here reviewed, and respectfully disagreed with it. (Order 75–9–114 at 5, J.A. 91). It is important to observe, however, that *Iberia* and *McCulloch* were both expressly premised on *Northwest Airlines, Inc. v. United States,* 444 F.2d 1097, 195 Ct.Cl. 356 (1971), which considered the degree of detail that had to be included in airline tariffs. The proposed inclusion in *Northwest* was a charge for unused seats, admittedly quite similar to the cancellation charges in question here, and the court decided that this charge need not be filed in the tariff. However, the Court of Claims found support for its *Northwest* decision in the fact that the government was the only charterer involved, and expressly stated that a differ-

---

**28.** On the varying degrees of deference that have been accorded to interpretative rules (and rulings), *see generally* 1 K. Davis, *Administrative Law Treatise* § 5.05 (1958).

ent outcome, *i. e.*, requiring inclusion of the unused seat charge in the filed tariff, would be *necessitated* in the event that the charge applied to the entire public (as it does here):

Section 403(b) has as its purpose the protection of the public . . . . *Obviously, where the entire traveling public is affected, there is every reason to require that a tariff set forth in detail the service charge for no shows.* . . . Where the only "traveler" concerned with a particular tariff is a Government agency . . . there is less reason for requiring that the tariff be complete in every respect . . . .

*Northwest Airlines, supra,* 444 F.2d at 1100–01 (emphasis added). The *Northwest Airlines* facts are not before us, but we are conscious of the fact that the Board here was issuing a declaratory ruling that applies to all charterers. The fact that the *Northwest* court would, by its own rationale, have upheld the Board's interpretation in the circumstances of this case undercuts the authority of the *McCulloch* and *Iberia* decisions, about which the District Judge had the following to say when the matter came up again for certification as an interlocutory appeal:

The difficulty I had in analyzing the issues passed upon in my earlier decision bespeaks the uncertain state of the law in this area and attests to the fact that there is substantial ground for difference of opinion involving the issues decided. This is particularly so with respect to the liquidated damages [for charter cancellation].

In reaching my decision on February 14, I relied heavily upon the fact that *Northwest Airlines, Inc. v. United States,* 444 F.2d 1097 [195 Ct.Cl. 356] (Ct.Cl.1971), stood alone on the issue. . . . However, subsequent to the filing of the February 14 order, my attention was called to a CAB "industry letter" dated July 5, 1974 and signed by Robert J. Sherer and William B. Caldwell, Jr., two CAB directors, which is directly on point and contrary to my ruling.

However, even assuming that defendant succeeds on appeal, complex issues would remain to be tried. [Hence, the requested interlocutory certification was denied].

*McCulloch International Airlines v. Anne Storch International,* 13 A.Cas. 17,994, 17,-995 (S.D.N.Y.1975).

With *Northwest Airlines* distinguished by its own language, and *McCulloch* defended only with great timidity by its own author, it is fair to say that our decision today does not run against the clear weight of any settled case law.

■ Relying on the factors set forth in *Skidmore v. Swift & Co., supra,* we feel that the Board's interpretation is, in light of the statute and the regulations, persuasive and in conformity with law. In arriving at the declaratory order here questioned, the Board was exposed to a variety of possible interpretations. Both World and Caledonian were afforded and made use of an opportunity for filing written statements with the Board. There was no dispute as to the facts. It cannot be said that the Board's decision was reached upon either an inadequate presentation or a one-sided consideration. Rather, it clearly appears that the Board's opinion was based upon a careful analysis of the rationale for requiring matters to be included in tariffs and of the importance of cancellation charges in the charter contracts of supplemental air carriers. Moreover, the Board's interpretation is consistent with the industry's own understanding of the statute and regulations, as judged by the large number of regularly scheduled and supplemental air carriers who already include cancellation charges in their tariffs.[29]

In light of the cumulative weight of all these factors, we are unable to find any significant merit in petitioner's attack on the reasonableness of the Board's decision. Finding no procedural or substantive infirmities, we affirm Order 75–9–114 in its

---

29.  *See* note 15 *supra.*

entirety, pursuant to our authority under 49 U.S.C. § 1486(d).[30]

*Judgment accordingly.*

**30.**  (d) Upon transmittal of the petition to the Board or Administrator, the court shall have exclusive jurisdiction to affirm, modify, or set aside the order complained of, in whole or, in part, and if need be, to order further proceedings by the Board or Administrator.  Upon good cause shown and after reasonable notice to the Board or Administrator, interlocutory relief may be granted by stay of the order or by such mandatory or other relief as may be appropriate.

49 U.S.C. § 1486(d) (1970).