**COMARK, INC., Plaintiff,**

v.

**UNITED PARCEL SERVICE, INC., Defendant.**

**No. 87 C 10332.**

United States District Court, N.D. Illinois, E.D.

Nov. 29, 1988.

John W. Aniol, Aaron E. Hoffman, Schwartz & Freeman, Chicago, Ill., for plaintiff.

Robert E. Arroyo, Michael J. Sreenan, Keck, Mahin & Cate, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Comark, Inc. ("Comark") has brought this diversity action against United Parcel Service, Inc. ("UPS") based on three separate C.O.D. shipments in which (1) UPS accepted checks as payment in a form other than that requested by Comark and (2) Comark lost money due to the uncollectibility of those checks. Both Comark and UPS have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, UPS' motion is granted and Comark's is denied.

### Facts [1]

Comark is a regular customer of UPS, shipping about 50 parcels each business day. About November 13, 1986 Comark placed with UPS a $2,985.48 C.O.D. shipment addressed to Data Forms in Rio Piedras, Puerto Rico, with the C.O.D. tag containing the instructions "certified check." UPS delivered the shipment, collected a check for the proper amount drawn on the account of Better Ribbons, Carolina, Puerto Rico, and sent the check to Comark. As well as following its regular procedure of matching each receipt with the corresponding C.O.D. tag (and indeed noting the disparity as an internal matter, but saying nothing about it to UPS), Comark deposited the check unconditionally. Although the check was dishonored for insufficient funds, Comark did not protest the check to UPS until some time in the late summer of 1987.

Beginning about May 20, 1987 Comark placed this sticker ("Sticker") on each C.O.D. parcel turned over to UPS for delivery:

NOTICE UPS DRIVER

Only accept checks imprinted with customer's name and address

No temporary checks accepted

---

1. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court draws all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). Where (as here) cross-motions are involved, this Court must therefore take a dual perspective—which might sometimes cause the denial of both motions. In this instance, fortunately, no material facts are in dispute and no inference drawing is required, so any such risk is eliminated.

BE SURE THAT NAME AND ADDRESS PRINTED ON CHECK MATCH C.O.D. TAG.

About May 21 Comark placed a C.O.D. shipment with UPS comprising several parcels addressed to J & D Electronics in Salt Lake City, Utah. Each parcel bore a Sticker, and the C.O.D. tags carried the instruction "company check o.k." UPS delivered the parcels and accepted four checks that did not bear the name "J & D Electronics" or the corresponding address. As with the Puerto Rico transaction, Comark deposited all four checks unconditionally. One cleared but three of them, totaling $1,687.15, were dishonored because the account was closed after the first one cleared.

Finally, about June 24, 1987 Comark placed a $17,438 C.O.D. delivery with UPS, comprising several parcels addressed to A. Hammond Wholesale & Export in Avenal, New Jersey. Again each parcel carried a Sticker, but this time the C.O.D. tags were legended "certified check only." UPS delivered the parcels and accepted a cashier's (not a certified) check in that amount. Once again Comark deposited the check unconditionally, and this time the check was dishonored as counterfeit.

UPS operates under a tariff (the "Tariff") filed with the Interstate Commerce Commission ("ICC"). Tariff § 480 authorizes the carrier to perform C.O.D. deliveries and states in part:

> Consignee's Checks in Payment of C.O.D.'s: Unless instructions to collect cash only are written on the C.O.D. tags, the carrier will accept checks from consignees in payment of C.O.D.'s. Such checks, accepted at the risk of the shipper, will be transmitted to the shipper together with the carrier's own check for amounts collected in cash.

UPS' policy is to consider cashier's checks, certified checks, money orders and cash as

commercial equivalents, but it never told Comark of that policy.

### Applicable Law

Interstate carriers like UPS are governed by the Interstate Commerce Act ("Act"), 49 U.S.C. §§ 10101–11917. Act § 10761 permits a carrier to provide ground transportation services only in accordance with a published tariff. There is no dispute that the parties here are bound by the Tariff.[2]

*Davis v. Henderson*, 266 U.S. 92, 93, 45 S.Ct. 24, 69 L.Ed. 182 (1924) and its progeny teach the terms of a tariff must be followed with strict adherence, with the rights it creates neither varied nor enlarged. Courts have consistently prevented parties from waiving or altering tariff provisions. Thus *Paulson v. Greyhound Lines, Inc.*, 804 F.2d 506, 507–08 (8th Cir. 1986) would not allow the parties to make a special arrangement to deliver goods by a specific time where the governing tariff required the carrier to delivery with "reasonable dispatch." And *United Video Buyers Association v. North Penn Transfer, Inc.*, 211 N.J.Super. 584, 512 A.2d 521 (N.J.Super.Ct.App.Div.1986), *aff'd per curiam*, 107 N.J. 410, 526 A.2d 1085 (1987) invalidated C.O.D. instructions placed on a document in a location other than that required by the tariff.

Thus the appropriate provisions of the Tariff control this dispute. Where the Tariff does not speak, Comark and UPS agree the terms of their contract (bill of lading) and Illinois law control.

■ In their principal dispute as to the meaning of terms in Tariff § 480, the parties disagree on the phrase "checks from consignee." Comark contends the Tariff authorizes UPS to accept only checks drawn on the account of the consignee. UPS urges the Tariff authorizes it to accept just about any check a consignee decides to provide.

---

**2.** Comark somewhat disingenuously cites *Lake Shore & M.S. Ry. Co. v. Davis,* 16 Ill.App. 425, 430 (1st Dist.1885) for the proposition that the carrier, once it accepts a shipment for delivery, is bound by all the consignor's shipping instructions. What Comark does not face up to is that

*Lake Shore* was handed down even before passage of the Interstate Commerce Act (hoary though that century-old statute is), thus rendering the case of even less force than its ancient vintage might otherwise suggest.

In support of its position, UPS complains of the burden that would be placed on a driver delivering a C.O.D. shipment under Comark's interpretation: It would be necessary for him or her to inspect the check and the C.O.D. tag to be sure the names and addresses corresponded.[3] In all candor, that hardly appears an onerous task calling for the exercise of judgments beyond the ordinary person's ken—and of course if that is what the ICC has prescribed, the place to seek relief is from that agency and not this Court.

UPS also relies on a Kentucky appellate case, *Shockley v. UPS*, 664 S.W.2d 523 (Ky.App.1984), but *Shockley* is inapposite here. In that case the shipper sent a C.O.D. parcel with instructions to accept "cash or company check." UPS accepted a check drawn on the account of a company with a name and address different from that listed on the shipment. In rejecting the shipper's argument that the accepted check was not a "company check," the Court of Appeals said "UPS was not advised upon which company such check could be drawn" (664 S.W.2d at 524).

There is no evidence in the *Shockley* opinion that the court had before it either the Tariff or its relevant language.[4] In plain English the Tariff term "check from consignee" clearly indicates "upon which company such check should be drawn"— the consignee itself:

1. In normal sentence structure the Tariff's words "from consignees" modify the immediately preceding noun "checks," rather than skipping over that word to modify the preceding verb "accept." Essentially UPS would read the Tariff as though it said "the carrier will *accept from consignees* checks in pay-

ment of C.O.D.'s." That language might arguably permit a consignee to deliver any check (its own or someone else's) in payment—but that is just not how the Tariff is drafted.

2. Again in common English, a "check from a consignee" means a check issued by (that is, "from") the consignee *to* someone (just as "from" always carries with it the correlative "to"). And if there were any conceivable doubt on that score, it is surely dispelled by Tariff § 480's caption "Consignee's Checks." *That* possessive term unquestionably means checks *of* a consignee (the same meaning just ascribed to checks "from" a consignee).

And that common-sense reading of the Tariff is matched by its common-sense purpose. When a shipper permits a check to be accepted on a C.O.D. shipment, that reflects a business decision to rely on the credit of the party with whom the shipper knows it is dealing: the consignee. In turn that means the shipper must accept the risk of receiving an uncollectible check drawn on the consignee's account, but it does not fairly embrace the different risk of receiving any other uncollectible check. Every check establishes rights and liabilities between the parties (see Ill.Rev.Stat. ch. 26, ¶¶ 3–301 to 3–409), and the shipper will not be deemed to have authorized UPS to subject it to those rights and liabilities with an unknown maker.

Nothing in *Shockley* calls for adopting a different construction of a Tariff term that is, after all, different from the term used in the contract before the court in *Shockley*—that latter term being not only different from the Tariff's language, but subject

---

**3.** In that respect UPS points out there may be cases where it is unclear, for example, whether the addressee is a company or an individual located in the company. That hypothetical scenario might require a little thinking on the part of the driver. But the issue is not raised by any facts in this case, nor is there any evidence as to the frequency of such occurrences or the amount of burden that might impose. Again the problem would not seem beyond normal competence.

**4.** It is true that the *Shockley* term "company check" also appears in this case on the C.O.D. tags to J & D Electronics. On that score Comark contends "company check" means "check drawn on the consignee company's account." Because this opinion holds that is already required by the Tariff, Comark is not forced to rely on its interpretation and the issue need not be decided. Certainly UPS cannot say the C.O.D. tags permitted acceptance of company checks where the Tariff did not—remember the Tariff's terms cannot be varied or enlarged.

to different rules of construction.[5] And if and to the extent *Shockley* might nonetheless be viewed as bearing on the question before this Court, it is of course nonbinding as reflective of Illinois law, and this Court would decline to follow it.

That then establishes the nature of the general duty of UPS as carrier. In that light the circumstances of the individual shipments may be reexamined.

■ In the first (Puerto Rico) transaction, UPS accepted an uncertified check drawn on the account of a non-consignee. It is therefore not important to consider the legal effect of Comark's instructions on the C.O.D. tag ("certified check"), for in any case UPS had no authorization to accept a non-consignee check. UPS breached its contract on the Puerto Rico shipment.[6]

In the Utah shipment, UPS did not accept checks from the consignee, J & D Electronics, but rather from an entity called Lake Data Systems. As with the Puerto Rico transaction, acceptance of a non-consignee check was a breach of the contract.

More difficulties are posed by the New Jersey shipment. There Comark put an instruction on the C.O.D. tag calling for "certified check only." UPS accepted what appeared to be a *cashier's* check, but actually turned out to be bogus.

That factual situation first presents the question whether Comark's instruction is a valid limitation under the Tariff, which permits UPS to accept checks from consignees "[u]nless instructions to collect cash only are written on the C.O.D. tags" (emphasis added). In literal terms "certified check only" is not identical to a "cash only" instruction. So if that Tariff provision were the only language that had to be looked at, the "check from consignee" limitation would continue to apply, and a cashier's check would not do the job.

But there is a second (and better) line of analysis that is suggested by the fact that UPS' trade usage is to treat certified checks and cashier's checks as cash equivalents. It must be recognized that the Tariff speaks to that question only indirectly—it authorizes UPS (in an earlier portion of Tariff § 480) to collect "the sum of money" shown on the C.O.D. tag, and also to accept (as it later says) "Consignee's Checks." Surely UPS needs no special instructions to accept *cash*—it could of course do so if the shipper were entirely silent in its directives.

In that sense Comark's New Jersey directive to accept a "certified check only" does not at all vary the Tariff's quoted expansion of UPS' authority to include the acceptance of consignees' checks. Instead it is no more than a specialized version of UPS' inherent authority to accept cash (Comark could not be heard to say its directive prohibited UPS from taking cash rather than a certified check from the consignee). And that in turn converts the question into one that asks whether the "certified check only" restriction—a valid direction because it does not conflict with the Tariff—should be read to exclude the other cash equivalent (a cashier's check).

By issuing its "certified check only" instruction, Comark manifested its intention to rely not on the credit of the consignee but rather on the credit of any bank on which the consignee drew its check (UCC § 3–411(1), Ill.Rev.Stat. ch. 26, ¶ 3–411(1)). And like a certified check, a cashier's check also depends upon the credit of the issuing bank (*Munson v. American National Bank and Trust Co. of Chicago*, 484 F.2d 620, 623–24 (7th Cir.1973)). UPS might reasonably contend the authority granted it to accept a valid certified check would also extend to accepting a valid cashier's check.

That however would not answer the precise situation here. Without doubt Comark could not complain if UPS had accepted

---

**5.** Ordinary contracts do not necessarily call for the same strict construction the law mandates as to ICC tariffs.

**6.** UPS argues it is not liable for the Puerto Rico shipment for another reason: Comark's failure to make a timely claim within nine months.

However, there is a genuine issue of fact as to whether a timely claim was made. Because this opinion ultimately decides UPS is not liable on other grounds, the factual issue is not material (that is, non-outcome-determinative), and UPS' "timely claim" argument need not be reached.

what appeared to conform to Comark's directive: a check that was apparently certified, but on which a regular-appearing bank certification turned out to be forged.[7] But does that mean UPS would also be within its authority in accepting what it did: a check whose appearance was that of a cashier's check, but that turned out to be forged?[8] It would seem so, because to hold otherwise would call on UPS drivers to be moonlighting law students, skilled in the arcane mysteries of the UCC. Fortunately that issue (one the parties have not thought of, let alone written about in their memoranda, in the terms expressed in this opinion) does not have to be resolved, given the discussion that follows.

### Ratification

■ Although UPS thus breached its contract on two shipments (and maybe even the third), it escapes liability if Comark ratified UPS' actions. Any principal may ratify the unauthorized conduct of its agent (*Reavy Grady & Crouch Realtors v. Hall*, 110 Ill.App.3d 325, 328, 66 Ill.Dec. 35, 38, 442 N.E.2d 307, 310 (4th Dist.1982)). As *Old Security Life Insurance Co. v. Continental Illinois National Bank and Trust Co. of Chicago*, 740 F.2d 1384, 1392 (7th Cir.1984) said (applying Illinois law):

> Ratification occurs when the principal, with knowledge of the material facts of an unauthorized transaction, takes a position inconsistent with the nonaffirmation of the transaction.

Comark had knowledge of all material facts. It understood the nature and purpose of all the checks when it deposited them. It is clearly charged with knowledge of what kind of payment it had requested from UPS in each instance.

Comark claims its deposits were not intended to ratify the transactions but rather to mitigate damages, and that an act will not be construed as ratification when it is readily explainable as not being the product of an intent to ratify (*Harris Trust & Savings Bank v. Joanna–Western Mills Co.*, 53 Ill.App.3d 542, 552, 11 Ill.Dec. 78, 86, 368 N.E.2d 629, 637 (1st Dist.1977)). But *Harris Trust* was a case in which ratification had to be inferred from *silence*. Here there is no question as to the meaning of Comark's acts. Had it wanted only to mitigate damages, it could have notified UPS of its intent or deposited the checks with a stated condition or qualification (see, e.g., *Mountain States Waterbed Distributors, Inc. v. O.N.C. Freight Systems Corp.*, 44 Colo.App. 433, 614 P.2d 906, 907 (1980)). On this point, this Court's colleague Judge Paul Plunkett has reached the same conclusion on almost identical facts in *National Diamond Syndicate, Inc. v. UPS*, No. 87 C 1076, slip op. at 5–8 (N.D.Ill. June 16, 1988) [available on WESTLAW, 1988 WL 67666] (appeal pending).

Comark, of course knowing the terms of its own directions (and legally presumed to know the terms of the Tariff, *Aero Trucking, Inc. v. Regal Tube Co.*, 594 F.2d 619, 621 (7th Cir.1979)[9]), and knowing the nonconforming nature of the payments it received from UPS, nevertheless unconditionally deposited the checks for the three deliveries. That unquestionably constitutes an unequivocal and binding ratification.[10]

---

7. This is just a way of saying that Comark rather than UPS takes the risk that an instrument that looks as though it meets the description Comark was willing to accept turns out to be something else because Comark's consignee (someone whom it rather than UPS chose to deal with) proves to be crooked.

8. Strictly speaking, the two *forged* instruments are not commercial equivalents: Any forged cashier's check is a nullity, because no one has issued it. But a forged certification on a valid check leaves the underlying check a valid negotiable instrument on which the consignee-issuer is liable.

9. Although *Aero Trucking* (like most of the cases in this area) addresses the legal principle stated in the text in terms of the *rates* established by a tariff, both litigants cite it for the more general proposition that all the *terms* of a properly published tariff become part of every contract between carrier and shipper (UPS Mem. 3 and R.Mem. 1; Comark Mem. 6 and 8).

10. Comark also points to UPS' having later agreed to reimburse Comark for already-deposited bad checks, as somehow negating the ratification argument. That position is without merit. Comark is a high volume customer of UPS. UPS cannot properly be penalized for its willingness to settle other disputes for business

*Conclusion*

There is no genuine issue of material fact, and UPS is entitled to a judgment as a matter of law. This action is dismissed.

reasons, and no negative inference should be drawn. As a matter of policy, this accords with the principles underlying Fed.R.Evid. 407 (evidence of subsequent remedial measures inadmissible to prove negligence) and 408 (evidence of offers to compromise inadmissible).