# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 98-1780EM

Imports, Etc., Ltd., a Missouri
Corporation,

      *

      *

         On Appeal from the United

      *

      *

      *

ABF Freight System, Inc., a
Delaware Corporation,

      *

      *

Submitted:  September 25, 1998

_____

_____

    Imports, Etc., Ltd. brought t
that ABF violated the terms of the parties' delivery contract by ac
payment not specified in their agreement.  The District Court[1]

---

    [1]The                                                   e
Eastern District of Missouri.

Imports, and ABF appeals that judgment. We affirm. We hold that a shipper and a carrier may lawfully contract for a specific form of COD payment.

On July 9, 1996, Imports and ABF entered into an agreement, the Alternate Straight Bill of Lading, for ABF to deliver 511 cartons of women's shoes to A&M Department Stores. The bill of lading included the specification that the delivery be "COD Cashiers Check," and that ABF collect payment on behalf of Imports. The ABF driver also had to collect a COD fee and freight charges. The driver arrived at the delivery location listed on the bill of lading to find a company named Bag Bazaar, rather than A&M. Bag Bazaar representatives contacted A&M representatives. Approximately one hour later several men and two Ryder rental trucks arrived with certified checks (as opposed to cashier's checks) for the COD and freight charges. Because the A&M representatives did not have a check for the COD fee additional telephone calls between A&M and ABF, and between A&M and Imports, followed. Eventually the ABF driver accepted the two certified checks and cash for the COD fee.

ABF endorsed and deposited the certified check for the freight charges. The check was later returned to ABF because the account upon which the check was drawn had been closed. Imports, however, neither endorsed nor deposited the certified check for the shoes. The certified check did not comply with the specific type of payment called for in the bill of lading. Additionally, Imports was suspicious of both the face of the certified check and the delivery circumstances. As it turned out, Imports' fears were well founded. Evidently the bank certification stamped on the face of the check in question was a forgery.

Imports then filed this action against ABF, seeking damages in the amount of $53,180.90, the full value of the COD payment. The District Court awarded Imports $53,180.90, plus interest, and ABF appeals.

We agree with the District Court that ABF broke its contract with Imports by accepting a bank certified check rather than a cashier's check for the COD payment.

It could be argued that virtually no difference exists between a cashier's check and a bank certified check (assuming both instruments are genuine). Both should be equivalent to cash. See Center Video Industrial Co., Inc. v. Roadway Package System, Inc., 90 F.3d 185, 188 (7th Cir. 1996). The use of either should therefore guarantee payment to the payee.

Missouri's Uniform Commercial Code[2] defines a certified check as "a check accepted by the bank on which it is drawn." Mo. Rev. Stat. § 400.3-409(d) (1998). Acceptance of a certified check is made either by the drawee's signature or "by a writing on the check which indicates that the check is certified." Mo. Rev. Stat. § 400.3-409(a), (d) (1998). Because the bank charges the drawer's account for the certified check amount at the time of certification, the bank guarantees the availability of the funds for the payee. See Center Video, 90 F.3d at 189. A cashier's check is defined as "a draft with respect to which the drawer and drawee are the same bank." Mo. Rev. Stat. § 400.3-104(g) (1998). The customer provides payment to the bank for the cashier's check at the time the bank issues the check. The bank therefore makes a guarantee to the payee for a cashier's check as well. See Center Video, 90 F.3d at 188.

The primary difference between a bank certified check and a cashier's check seems to lie in the ease with which one can create a fraudulent instrument. In order to forge a cashier's check one would need to replicate all of the features of the bank's form. To forge a bank certified check, on the other hand, one need only have a writing on the check indicating that the check is "certified."

---

[2]Neither party raised the issue of applicable state law. The District Court refers to Missouri law, and we will do the same.

In any case, Imports had a right to believe that a cashier's check is a better form of payment than a certified check. The agreement that ABF would accept only a cashier's check reflects this belief. Imports relies on a case in which a carrier which accepted a corporate check rather than a cashier's check as COD payment was held in breach of its contract with the shipper. See Computel, Inc. v. Emery Air Freight Corp., 919 F.2d 678, 682 (11th Cir. 1990). Although a certified check differs from an uncertified corporate check, the decision highlights the importance of Imports' interest in the form of payment it specified, and to which ABF agreed. Imports did not agree to accept the risk that a certified check might be fraudulent. Instead, it contracted for a more secure form of COD payment.

ABF invokes what is commonly called the "filed rate doctrine," though it does not use those words. Under the Interstate Commerce Act, the filed rate doctrine requires that a carrier "not charge or receive a different compensation for the transportation or service than the rate specified in the tariff." See 49 U.S.C. § 13702(a) (1998). As a common carrier, ABF is subject to the requirements of the Act. See 49 U.S.C. § 13501 (1998).[3]

A recent United States Supreme Court decision addressing the filed rate doctrine helps highlight the issue between ABF and Imports. See American Telephone and Telegraph Co. v. Central Office Telephone, Inc., 118 S.Ct. 1956 (1998). The Court analyzed the filed rate doctrine under the Communications Act. See id. at 1962. The Communications Act provisions are modeled after the Interstate Commerce Act, and

---

[3]By contrast, the filed-rate doctrine does not apply to contract motor carriers. One court has held that the question whether a carrier is a common carrier or a contract carrier is within the primary jurisdiction of the Interstate Commerce Commission (whose functions have now been transferred to the Surface Transportation Board). Jones Truck Lines, Inc. v. Acme Frame Prods., Inc., 1994 WL 408746 (E.D. Ark.). ABF's status as a motor common carrier is not in question in this case.

both acts aim to prevent discriminatory charges. The same analysis applies in the present context.

The filed rate doctrine does not apply to rates alone, but to any terms or practices that might affect the rates as well. See id. at 1963. See also 49 U.S.C. §13702(a) (1998). American Telephone and Telegraph reversed the Ninth Circuit's judgment that the filed rate doctrine did not apply to the case because the terms in question dealt with special services for filling orders and billing rather than directly with rates. See American Telephone and Telegraph, 118 S.Ct. at 1964. Special services can, however, affect rates. "An unreasonable 'discrimination in charges' . . . can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price." Id. at 1963 (quoting Competitive Telecommunications Assn. v. FCC, 998 F.2d 1058, 1062 (D.C. Cir. 1993)). For AT&T and COT, the parties in American Telephone and Telegraph, the proffered special services affected the rates because COT would get more for its dollar. Paying the filed rates and receiving additional services at no extra cost "is certainly a privilege within the meaning of . . . the filed-rate doctrine." Id. at 1964.

The key, however, is not only whether agreed-upon terms outside of the tariff provide one party with a benefit, but also whether the other party incurs an additional cost. The filed rate doctrine bars any "special agreement which affects the value of the service to the shipper and [the] cost to the carrier." Id. at 1966 (Rehnquist, C.J., concurring) (quoting Chicago & Alton R. C. v. Kirby, 225 U.S. 155, 165 (1912)). We do not see how the agreement in the bill of lading that ABF would accept only a cashier's check as COD payment increased ABF's costs. The filed-rate doctrine, therefore, does not bar this action.

ABF claims that the District Court erred by considering only the bill of lading, and not the terms and conditions of ABF's tariff as well. The bill of lading incorporated the tariff by reference. ABF's tariff lists the forms of COD payment

accepted by ABF as (1) cash up to a maximum of $500.00; (2) bank cashier's check; (3) bank certified check; (4) money order; or (5) personal check of the consignee when so authorized by the consignor.  The bill of lading, on the other hand, directed ABF to accept only a cashier's check as COD payment.

The District Court did not ignore ABF's tariff.  The Court pointed out that although ABF's tariff allows for COD by certified check, the bill of lading specifically stated that only a cashier's check was acceptable payment for this particular delivery.  We do not see a necessary conflict between ABF's tariff and the bill of lading.  The tariff does not expressly state that the parties to the contract may elect one of the enumerated forms of payment.  Nor, however, does it indicate that  if the parties do so, such a choice is barred.

ABF also claims that if a conflict arises between a bill of lading and a tariff, the tariff prevails.  In some cases a tariff will prevail over a conflicting term or condition in a bill of lading.  See M.E. Denby v. Seaboard World Airlines Inc., 737 F.2d 172, 186 (2[d] Cir. 1984).  Most of those cases, however, address conflicts related to the rates a carrier lists in its tariff.  When the conflicting agreement provides the shipper or other party to the agreement with preferential rates, whether directly or indirectly, the tariff will prevail.  If, however, the agreement does not relate to the rates, the tariff need not necessarily prevail.  Special arrangements for a specific delivery time, for example, indirectly affect the rate.  A shipper who contracts to have goods delivered in less time than that specified in the tariff saves money by having the goods delivered in less time.  Therefore, when a contract specifying a certain delivery time conflicts with the terms of a tariff, the tariff terms prevail.  Comark, Inc. v. United Parcel Service, Inc., 701 F. Supp. 641, 643 (N.D.Ill. 1988).  When contract terms do not affect rates, or simply complete or supplement tariff terms, a different rule applies.  Accordingly, a contract provision requiring the purchaser of airline tickets to pay for the tickets even when the tickets remain unused does not conflict with the airline's filed tariff.  The no-show provision does not affect the rate or terms of the tariff.  It simply indicates that payment

was due regardless of use.  <u>Northwest Airlines, Inc. v. United States</u>, 444 F.2d 1097, 1100-01 (Ct. Cl. 1971).  Contract terms regarding acceptable types of COD payment similarly do not affect filed rates.

Requiring uniformity in the rates charged by a carrier, and barring special agreements relating to those rates, helps prevent discrimination.  An agreement between a shipper and a carrier regarding the type of acceptable COD payment, on the other hand, does not purport to vary the rates set in the tariff.  It does not result in preferential rate treatment.  It does not increase the carrier's costs.  Contracting for a carrier to accept only a certain type of COD payment, one listed as an acceptable form of payment in the carrier's tariff, is not an unlawful agreement between shipper and carrier.

For these reasons, we affirm the District Court's judgment in favor of Imports.

BEAM, Circuit Judge, dissenting.

The court chooses to side-step the well established requirements of the "century-old filed rate doctrine," <u>American Telephone and Telegraph Co. v. Central Office Telephone, Inc.</u>, 118 S. Ct. 1956, 1962 (1998) (AT&T), in its construction (in my view, misconstruction) of the shipper/carrier contract at issue in this case.  In the process, the court reaches an exceedingly unjust result.  Accordingly, I dissent.

Imports Etc., Ltd. (Imports) apparently decided to do business with a group of base individuals or, at least, with an entity operated by persons who were, it seems, dishonest.  Apparently sensing the risky nature of this particular transaction, Imports unilaterally added the words "COD CASHIERS CHECK" to the face of the Alternate Bill of Lading (BOL) delivered to ABF Freight System, Inc.'s (ABF) truck driver.  These additional words were inserted, as I understand it, without any meaningful negotiations between authorized officials of either party.  These words, so the court

says, modified the ABF tariff that was in full force and effect and incorporated by reference into this contract for truck transportation and COD collection services. Under this purported modification, ABF not only loses its shipping fee of $2,843, but is also victimized by Imports' risky dealings to the tune of $53,180.90, the alleged value of the shoes delivered to Imports' nefarious customer.

The Supreme Court reminded us in 1998 that the "filed rate doctrine" is alive and well. See id. at 1963. Shippers are charged with notice of it and carriers must abide by it. See id. at 1962-63. And, the doctrine deals not just with rates, because they do not exist in isolation, but also extends to nonprice features, such as COD collection services. See id. at 1963.

There is no dispute between the parties that ABF's published tariff was incorporated in the bill of lading by reference and was part of the transportation contract. The tariff reads in pertinent part: "Only the following forms of payment will be accepted: (1) cash up to maximum of $500, (2) bank cashier's check, (3) bank certified check, (4) money order, or (5) personal check of the consignee when so authorized in writing by the consignor."

I concede that the Negotiated Rates Act of 1993, Pub. L. 103-180, 107 Stat. 2044 (codified as amended in scattered sections of 49 U.S.C.), provides for some shipping rate exemptions and for some defenses against carrier "undercharge" claims, and the Trucking Industry Regulatory Reform Act of 1994 (TIRRA), Pub. L. 103-311 Title II, 108 Stat. 1683 (codified as amended in scattered section of 49 U.S.C.), eliminates the need for carriers to file tariffs containing individually negotiated rates with the Surface Transportation Board. However, neither Act eliminated the filed rate doctrine or the use of tariffs, nor are the terms of these Acts directly applicable to this dispute. There are no undercharge or exemption claims at issue nor is an individually *negotiated* shipping rate in dispute.

Under the filed rate doctrine, the shipper is charged with knowledge of the contents of the tariff. See AT&T, 118 S. Ct. at 1962. Traditionally, even if the carrier and shipper negotiated for new rates or services, the shipper had no right to rely on anything other than the filed tariff, which allowed no deviation in rates or services. See id. at 1963. In the trucking industry, now that carriers are allowed under TIRRA to negotiate individual tariff conditions, deviation is allowed *when negotiated*. Under the facts presented in this case, there is no indication that an agreement deviating from the tariff was contemplated by either party, much less negotiated. The issue then becomes one of tariff interpretation. Tariffs are interpreted using the same principles as contract interpretation. See Carrier Serv., Inc. v. Boise Cascade Corp., 795 F.2d 640, 642 (8th Cir. 1986).

The tariff provision is not ambiguous on its face. Clearly, there is no language present which can be construed as giving the shipper a choice of one method to the exclusion of others. Even if the tariff were ambiguous, it could only be construed as providing a shipper an option if Imports presented evidence of custom and usage in the industry, or past course of dealings. No such evidence was advanced. Indeed, the fact that the shipper is specifically given an option regarding a consignee's personal check, but given no other options, argues strongly that the tariff precludes the menu theory advanced by Imports and the court.

Under the filed rate doctrine, Imports had no right to rely on any modification of the rate or service provided for in the tariff. See AT&T, 118 S. Ct. at 1962-63. Even under the more relaxed statutory framework now in place, an effective tariff, without *negotiation* to the contrary, must control the relationship between the shipper and carrier. To argue otherwise is to assert that carriers must give their drivers authority to modify their tariffs. While drivers must necessarily have the authority as agents of the carrier to count and inspect loads, and sign a BOL, thus binding the carrier to certain liabilities anticipated under the terms of the tariff, without any indication to the contrary, a driver cannot be expected to have the authority to bind the carrier to

promises not contained in the tariff. Under the court's theory, if the shipper writes "20% discount" on the BOL and the driver signs for the load, the carrier is bound by the lower rate. Without actual negotiations to strike an individual deal, the tariff simply cannot be modified in the manner suggested by the court.

Similarly, under a straight contract analysis, the extra service of collecting only a cashier's check is unsupported by additional consideration. The court asserts that the filed rate doctrine does not bar a special arrangement unless the shipper receives an increased value *and* the carrier incurs increased cost. I find no case law or statutory support for this holding and the court cites none. Such an analysis of the filed rate doctrine bears no relationship to the purpose of the doctrine–the prohibition of discriminatory pricing and practices. Even if the court's theory is correct, it is inapplicable here. By Imports' attempted limiting of the allowed forms of COD payment, ABF incurred a greater risk by increasing its exposure to potential liability. Greater liability results in greater cost, in this case, $56,023.90 worth.

The court also holds that the modified service allegedly agreed to by the parties did not "affect the rate" and is therefore not barred by the filed rate doctrine. Imports received a service—at no charge—not provided for in the tariff. In essence, they got more for their money, thus affecting the rate. See id. 118 S. Ct. at 1963. (a filed rate violation can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price).

Under both the law and the equities, the court's result is wrong. I dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-10-